Argued and submitted March 9, 2017; resubmitted en banc October 16, 2018;
reversed and remanded December 4, 2019

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ELOY VASQUEZ-SANTIAGO,
*Defendant-Appellant.*

## Washington County Circuit Court
## C122203CR; A159499

456 P3d 270

Defendant appeals a judgment of conviction for murder, arguing that the trial court erred in admitting evidence of confessions he made during two separate police interrogations. In those interrogations, the police communicated to defendant—who is an illiterate, immigrant man with significantly subaverage intellectual functioning—that three members of his family, including his nursing, infant son, were in custody and that his entire family was suffering as a result of that custody. Moreover, as defendant argues, the police also communicated that the key to securing his family members' release and ending their suffering was for defendant to confess to the murder. In defendant's view, a confession obtained under those circumstances is involuntary and therefore inadmissible under Oregon law. The state argues that defendant's confession was voluntary. *Held*: In keeping with the recent decision in *State v. Jackson*, 364 Or 1, 430 P3d 1067 (2018), the Court of Appeals concluded that the police communicated inducements to defendant through both threats and promises. The police had failed to tread cautiously around the subject of familial relationships—particularly, defendant's parental attachment to his infant son. The parent-child bond is so visceral that, in this case, its use as a point of leverage in the interrogations rose to the level of improper inducements sufficient to undermine the reliability of defendant's confession. Moreover, as in *Jackson*, the state failed to demonstrate that, under the totality of the circumstances, defendant's will was not overborne by those inducements. Thus, defendant's confessions were involuntary, and the trial court erred in denying defendant's motion to suppress the confessions.

Reversed and remanded.

En Banc

Donald R. Letourneau, Judge.

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Egan, Chief Judge, and Armstrong, Ortega, DeVore, Lagesen, Tookey, DeHoog, Shorr, James, Aoyagi, and Powers, Judges, Hadlock and Garrett, Judges pro tempore.

JAMES, J.

Reversed and remanded.

Garrett, J. pro tempore, dissenting.

**JAMES, J.**

Few things are more powerful than the familial bonds that tie us together—especially the bonds of love and protection that a parent has for his or her child. When those bonds are used as a pressure point to induce a confession to a crime, there is a risk: Was the confession a product of free will, or the result of an inducement of hope or fear such as to render the confession unreliable? That question, and how a court goes about arriving at an answer, is the essence of this case.

Defendant appeals a judgment of conviction for murder, arguing that the trial court erred in admitting evidence of confessions he made during two separate police interrogations. In those interrogations, police communicated to defendant—an illiterate, immigrant man with an IQ of 53, a number associated with mental retardation and significantly subaverage intellectual functioning—that three members of his family, including his infant son, were in custody, that his entire family was suffering as a result, and that the key to securing the family members' release and ending that suffering was for defendant to confess to the murder. In defendant's view, a confession obtained under those circumstances is involuntary and therefore inadmissible under Oregon law.

In light of the Oregon Supreme Court's decision in *State v. Jackson*, 364 Or 1, 430 P3d 1067 (2018), we agree with defendant. For the reasons explained below, we conclude that, as in *Jackson*, police communicated inducements to defendant through both threats and promises and the state failed to demonstrate that, under the totality of the circumstances, defendant's will was not overborne by those inducements. We accordingly reverse and remand.[1]

## BACKGROUND

The relevant facts are undisputed. The victim, a 56-year-old woman who worked with defendant as a field worker at a berry farm, left home one morning in August

---

[1] Defendant also challenges the restitution award of $3,030 imposed at sentencing. In light of our resolution of defendant's first assignment of error, we need not reach that issue.

2012 after talking to defendant on the phone. When she did not return, her daughter notified the police.

Defendant was quickly identified as a suspect in the victim's disappearance. Detective LaMonica learned that defendant lived in Woodburn with his family, including his father, Benito; his brother, Moises; his "common-law wife," Jacinta; his infant son; his mother; and his two sisters. Defendant, however, had abruptly left the Woodburn house and taken his wife, the baby, his father, and his brother with him. LaMonica's investigation connected the family with an address in Madera, California. In late September, a few weeks after the victim's disappearance, LaMonica traveled to California with Detective Ganete.

Meanwhile, defendant's father and brother had been arrested on unrelated local charges in California. After arriving in California, the detectives made contact with defendant's father and brother at the police station. His father and brother informed the detectives that, on the morning of the victim's disappearance, defendant had taken his father's van without permission, saying that he was going to see his "girlfriend." When defendant returned later that day, his father and brother observed blood on his hands and on both the inside and outside of the van. According to his father and brother, defendant told them that he had become upset with the victim and hit her, and that they had to "run." The men explained that, after the family arrived in California, defendant left them and continued on alone to Mexico. From there, defendant called his father and brother and said that he had killed the victim by stabbing her.

The detectives next visited defendant's wife and inquired about defendant's whereabouts. They left their contact information with her and began the return trip to Oregon. Defendant's father and brother were still in jail in California on the local charges.

While the detectives were traveling back to Oregon, defendant, who had evidently been contacted by his wife, called Ganete and expressed concern that defendant's father, brother, and infant son were in police custody. As Ganete made clear in his testimony, defendant's reason for

contacting police was to secure the release of his family, including his infant son:

> "[PROSECUTOR]:   Detective Ganete, when the defendant first called you, what did he say he wanted from you?
>
> "[GANETE]:   He wanted his father, his brother, his son released from police custody."

The roadside telephone conversation between defendant and the detectives occurred in Spanish, as did the police interactions with defendant that followed. Although defendant's son had never been detained, Ganete did not correct defendant on that point. Ganete said that he wanted to talk to defendant about the victim and he advised defendant to turn himself in at the California-Mexico border. Defendant replied, "I want you to go leave the little boy with his mom, because he's breast feeding, and let my dad go." Again, the detective did not correct defendant's belief that the infant was detained and separated from his mother. Rather, Ganete responded, "I can't make that kind of a deal until I talk to you in person. I don't make deals on anything, because I'm not in a position to make deals." At the end of the conversation, defendant agreed to turn himself in, but he continued to request that Ganete release his son.

The next day, defendant turned himself in at the border. When he was finally able to cross the border, defendant immediately notified the local authorities in San Ysidro, California, that he was seeking the release of his infant son.

LaMonica and Ganete interrogated defendant in the San Diego county jail beginning at 10:00 p.m. The interrogation lasted until approximately 12:45 a.m. It began with Ganete reading defendant his *Miranda* rights, which defendant acknowledged understanding. Defendant said that he knew that he was a suspect in the victim's disappearance and that the police "took" his father, brother, and infant son for that reason. Defendant explained that he had turned himself in because of the choice police had given him regarding his "defenseless baby." He also reiterated his belief that the baby was still at an age that he needed to be breast fed:

"[DEFENDANT]:  *** [T]hey think that I'm suspect *** of these and that's why they're detaining him.

"[GANETE]:   Uh-huh.

"[DEFENDANT]:   My baby is now about—he was born in April. He was born in April. I don't know if he's only five or six months old. And he is still breast feeding.

"[GANETE]:   Okay."

The detectives did not correct defendant's misunderstanding that his son was detained. Rather, again, they reinforced defendant's misconception and explicitly adopted it as their own version of events. When defendant said that his wife had reported that the police "detained my dad, my brother and my son," Ganete replied, "Yes. Uh huh, exactly. They are in custody for now."

As the interrogation proceeded, defendant denied killing the victim and continued to express concern for his infant son, as well as for his father and brother. Ganete, meanwhile, referred to defendant's family and their "suffering" in exchanges with defendant. Ganete stated, "I don't want your family to *** suffer for something that I know you are responsible for. I don't want the other family to suffer from not knowing where their family's body is. I don't know where the body is."

Ganete explained to defendant that, unless he could recover the victim's body, defendant's father and brother would be detained because "they are witnesses that, that have to go to the court and say, '[Defendant] told me that he killed her.' Your dad has to testify and [your brother] has to testify." Ganete later stated,

"I believe that in your heart you want to settle this. You don't want to leave it like this—a mess. You—I believe your dad and your mom and your family don't deserve this, because everyone is suffering right now.

"*****

"One family has a dead relative and they don't know where she is and they'd at least like to give this woman a decent burial. And I have another family—

"*****

"—suffering over their son, that they want their son to tell the truth so the family can have peace. I have two families and you are the key to this."

Ganete told defendant that, unless he "told the truth," his father and brother would remain key witnesses in the case, but that if defendant confessed, his father's and his brother's testimony would become less important. Defendant then discussed a possible deal with the detectives, in which he would confess in exchange for his family's release:

"[DEFENDANT]:  \*\*\* When are you going to let my family go?

"[GANETE]:  *I can't let your family go until I find that body.* And not until I get the truth from you. Because they are the only witnesses who can say what you told them.

"[DEFENDANT]:  I want to assure you of one thing.

"[GANETE]:  Tell me.

"[DEFENDANT]:  If you . . . *let my family go right now and I will tell you the truth.* Just like I told you there, I'll tell you here. I'm sincere.

"[GANETE]:  You're telling me that if I—what you're telling me is *if your dad and brother get out of jail—*

"[DEFENDANT]:  *And my son.*

"[GANETE]:  *—and your son*, you will tell me where the body is and everything that happened.

"[DEFENDANT]:  Yes.

"[GANETE]:  You will take me exactly to where it is, where, where you dumped the body.

"[DEFENDANT]:  If you take me there to my family. I want to see that they are free and I will go with you.

"[GANETE]:  Okay. The problem is that, uh—

"[DEFENDANT]:  There you have it.

"[GANETE]:  The problem is that—

"[DEFENDANT]:  I know that this—

"[GANETE]:  They are my key witnesses."

(Ellipsis in original; emphases added.)

Ganete, who was speaking with defendant in Spanish, then brought LaMonica into the exchange:

"[GANETE]:   Let me tell Detective LaMonica what you're telling me. So he's saying he will take us to the body and tell us everything that happened if his father and his brother go free.

"[LAMONICA]:   You want me to—

"[DEFENDANT]:   *The baby.*

"[LAMONICA]:   You want me to tell him and you can translate?

"[GANETE]:   Absolutely.

"[LAMONICA]:   Okay, Uh, okay, [defendant], thank you. The family needs this, okay?

"[DEFENDANT]:   *Baby.*

"[LAMONICA]:   *Your, your baby needs this.*

"[GANETE]:   Your family needs this.

"[LAMONICA]:   Your baby needs his grandpa. We cannot make you any promises, we're not allowed to.

"[GANETE]:   We can't make, make you promises because we—the law doesn't allow us to make promises."

(Emphases added.)

LaMonica proceeded to explain that "they're in custody because they know the facts, and nobody else does, other than—we know what they're telling us," and that "until we can verify those facts[,] whether it be through you or through finding the body or both[,] then we have to keep them in custody[,] so we can proceed with, with the case." LaMonica explained that he did not "have any problems, uh, asking the DA's office to, uh, let them be released from custody, if we can find the body, and if we can, and, and if you can be, uh, truthful about what happened. *** But I can't promise you that, but I will do my best to make that happen." The detectives then addressed the need for defendant's father and brother to be released to support defendant's family:

"[GANETE]:   And we know that it's very important that your dad and brother work because they are the ones

who support the family and I know that's important to you and to the family. And that is the, the perspective of Detective LaMonica. He is the primary investigator in this case. Of course I am helping do the interviews in this case but, uh, let me say something. I know that what you're, uh, proposing and I know that you're doing this for your family. I understand."

On multiple occasions, Ganete pointed out the limits of his ability to negotiate. He told defendant that "[a]s detectives we don't have, uh, neither the responsibility nor the power under the law to make a deal with someone 'if you do this, I'll do that' and so on. What we can do is, uh, pass the information on to the person who makes the decisions on this case." He and defendant then discussed the leverage—or, in defendant's words, "the little hook"—that the police had:

"[GANETE]:   *** Uh, what we know is that your dad and your brother are key witnesses in this case. And they are less key if we validate the information they gave us through you. That means that if you tell me exactly what happened and tell me exactly where, where I can find that woman, then they aren't so critical to this case because it comes straight from you. But if I don't hear anything out of your mouth, nothing comes from you, they are the key people who can say—

"[DEFENDANT]:   The little hook.

"[GANETE]:   Yes, exactly.

"[DEFENDANT]:   Yes.

"[GANETE]:   They are the hooks of the case. And the way you release that hook is if you take the responsibility of saying, 'well, uh, I'll tell what it is, I'll tell you what happened' and his testimony, theirs, won't have the same value as your testimony, and that's why the hook, that hook's not to—

"[DEFENDANT]:   Also to pull me.

"[GANETE]:   Yes. Exactly. Just as you want the hook with me—

"[DEFENDANT]:   Uh-huh.

"[GANETE]:   —that if I don't give you—if your father and your brother aren't freed—

"[DEFENDANT]:   No—

"[GANETE]:   —you are not going to tell me—"

The detectives later repeated that they lacked authority to negotiate, stating that "my hands are tied to [a] certain point because I—we are detectives, we are not judges or district attorneys who take the cases and go to court and so on." Ganete then had this exchange with defendant:

"[GANETE]:   * * * Now the—for us it's, uh, as important for your family and for everyone that knows—knows the truth. You know that if the truth comes forward, all will be freed. The family will be freed from being able to find its relative and to be able to give her a proper burial; *your family will be freed because like—to use your word—the hook in this case which is your dad and [brother] is not so critical because things come straight from your mouth.* For you, it's having that personal freedom about what happened— Because this is something you can't live with in your heart your whole life. You can't live with this. Absolutely not. Absolutely not. You have to free yourself of that. The truth will solve this case for everyone. Like you asked me, as an officer what do I gain by this? I gain bringing peace to everyone, to the whole family, closing a case, you go on with your life, that family to have peace, *your family to be able to go on living so that your child can get ahead, your wife can get ahead and we can fulfill—spread the benefit of the truth among everyone.* And [defendant], only you have the key. Why kid ourselves? Here. It, it—I don't know how I can explain it any clearer than this.

"[DEFENDANT]:   Yes, but I want my family to be free.

"[GANETE]:   And me too. Your family are cool people. I, I really liked talking to your dad and your brother. I met your mom, * * * I met your whole family. And do you believe I—do you think I have the pleasure and I enjoy watching a family suffer? I don't think you think that of me because I've shown you I'm not that kind of person. *To the contrary, I've constantly shown you that all this is to benefit your family and everyone from all angles. So this is not something that, that the police take a great satisfaction [in] bringing trouble to your family and have them all suffer.*"

(Emphases added.)

Ganete further stated that defendant's father and brother "didn't tell me everything" and that "I know there's a part you didn't tell them. And that is the part you have that frees all, everyone. But that freedom, that decision is yours." Later, the detective stated, "I don't want to see your family suffer any longer. *** Because that's not right and you know that it's not right. Not for you or the other family, or for your mother or your father or no one. We have to stop the suffering. And you have to have peace in your heart."

Twice more the detectives stated that, although they lacked the authority to agree to release defendant's family, they would report the details of the interrogation to the prosecutor, including whether defendant had cooperated, and that a confession would benefit defendant's family:

"[GANETE]: *** Simply, I can't make promises to you but I will tell you that I will fight as hard as I can to indicate in my report and to put in black and white that you were honest with me, you have told the truth, and that you've cooperated with the police and that you made a huge effort to come from Tijuana and turn yourself in—

"[DEFENDANT]: Uh-huh.

"[GANETE]: —that you take responsibility for what happened and that you are a straight, sincere person and have taken responsibility for what happened. That's what I want to put in my report. That's what I want to show the district attorney and show everyone who reads my report, that you are a man who made a mistake[.]

"* * * * *

"[LAMONICA]: The more responsibility you accept, the, the more cooperation you are helping, helping the family have closure, helping your family have closure[.]

"* * * * *

"[LAMONICA]: *** [E]very day that she is out there is another day that your dad and [your brother] are in jail and not able to support your family.

"* * * * *

"[GANETE]: *** [E]ach day we are not able to close this case in the sense of not knowing the details and how

it all happened is one more day that your dad and [your brother] have to be in jail because we, we aren't able to free this. And of course the sooner we can free this case and come to the conclusion of what happened the sooner I can move this case forward[.]"

After defendant questioned whether a proposed deal could be unwound because of "lies," Ganete explained:

"Oh, what you're asking me is if you, if you are truthful with me—

"[DEFENDANT]:   Uh-huh.

"[GANETE]:   —that we won't do anything to release—

"[DEFENDANT]:   Uh-huh.

"[GANETE]:   —your dad and your mom, well—sorry, your family. Oh, no. Because like I told you, uh, I'm not in the position to make this kind of deal.

"[DEFENDANT]:   Uh-huh.

"[GANETE]:   What I can do—

"[DEFENDANT]:   Yes, yes, yes—

"[GANETE]:   What I can do—

"[DEFENDANT]:   Yes, you told me, uh-huh.

"[GANETE]:   *I can fight for that*, [defendant]. Like I say in the way I present the information—

"[DEFENDANT]:   Uh-huh.

"[GANETE]:   —is that I'm going to put exactly what you and I talked about in my report.

"[DEFENDANT]:   Uh-huh.

"[GANETE]:   And I put in my report your effort to cross the border, the conversations we've had, your honesty with me, the exact details of what happened so I can show—I want to show in my report what kind of person you are. And I want to put in my report your wish to have your mom, your dad, you brother, for your family to be free and for them to not be responsible for something they didn't do. And I want to put that in my report.

"[DEFENDANT]:   Uh-huh.

> "[GANETE]:   And the way I can put all these things in my report is if you and I have an honest conversation."

(Emphasis added.)

As the interrogation continued, defendant admitted to seeing the victim on the day of her disappearance but denied killing her. Ganete replied that, because he believed that defendant was being untruthful, the detectives would end the interview and tell the prosecutor that defendant was being uncooperative. Defendant then confessed to murdering the victim by stabbing her. He then immediately asked for the release of his baby, father, and brother: "I killed her but I want you to let my son and dad go. *** And my brother. *** I want them to be free." Less than 24 hours later, the detectives interviewed defendant again for five minutes and defendant affirmed his confession. Defendant was indicted for murder.

Defendant later moved to suppress the evidence from both police interrogations on the ground that his confessions were involuntary. After a hearing on the suppression motion, the trial court made the following findings:

> "The defendant is fluent in Spanish. Detective Ganete is fluent in Spanish. All the interrogation was in Spanish. There were no communication problems. The interview was polite in tone throughout.

> "The defendant is a Mexican citizen. He has worked as a migrant worker in Oregon. He has an IQ of 53 and no education. His limited IQ and lack of education did not impede his interaction with the detectives. He was not suffering any psychosis during his interactions with the detectives. Although the defendant had slept little in the proceeding [*sic*] days, he did not manifest any drowsiness during the interrogation. The defendant was not under the influence of any intoxicants.

> "*****

> "[T]he defendant repeatedly voiced his concern that his child, father, and brother were in custody. The transcripts reflect over ten times in which the defendant referred expressly to his concerns about his son being in custody. Detective Ganete did not believe the child was in custody, but never corrected the defendant's misunderstanding.

Rather on one occasion he affirmatively agreed with the defendant's statement that the child was in custody. * * *

"In his exchanges with defendant, Ganete focused on the custody status of the brother and father rather than referencing the child.

"The defendant consistently tried to negotiate that he would give a full statement regarding the incident in return for his family being released from custody. The detectives time after time told the defendant that they could not make such a deal, but that they would report his cooperation to the prosecutors in an effort to get the brother and father released from custody.

"* * * * *

"The defendant confessed because of his subjective hope that his cooperation would lead to the release from custody of his son, father, and brother."

The trial court also reached the following legal conclusions:

"* * * Ganete's failure to correct the defendant's misconception that his son was in state custody as well as the detective's affirmation of the misconception constitutes police deception.

"* * * * *

"Here the police never made a promise that defendant's cooperation would lead to the release of the son or the adult relatives from custody. They did make a permissible promise that they would forward defendant's cooperation to the prosecutors and attempt to secure the release of the adult relatives.

"* * * * *

"The defendant confessed because of his subjective hope that his cooperation would lead to the release from custody of his son and his adult relatives.

"Under the totality of the circumstances, the defendant's statements were the product of an essentially free and unconstrained choice. Defendant's free will was not overborne and his capacity for self-determination was not critically impaired."

The trial court denied defendant's motion to suppress and his confessions were admitted as evidence at trial.

The jury found defendant guilty of murder. Defendant now appeals the resulting judgment of conviction, assigning error to the denial of his motion to suppress the confession, which he argues was involuntary under ORS 136.425(1)[2] and Article I, section 12, of the Oregon Constitution.[3] While this case was under advisement, the Oregon Supreme Court issued its opinion in *Jackson*. As a result, we asked the parties to rebrief the arguments in light of *Jackson*'s analysis. The briefing provided by both parties has been valuable in helping us approach the issues in this case.

According to defendant, the detectives engaged in conduct that, under the totality of the circumstances, rendered his confession unreliable as a matter of law. Specifically, defendant argues:

> "As the trial court found and as supported by the record, the detectives deceived defendant into believing that his son was in custody and, given the circumstances, defendant's belief was reasonable. The detectives then made an implied promise: the detectives would release or, at least, work hard to release defendant's son if defendant stopped 'lying' and confirmed what the detectives already knew about the case. Defendant directly responded to that promise and confessed in the hopes of securing the release of his son."

That is, in defendant's view, a confession induced by that type of deceptive coercion is involuntary, even if the detectives hedged as to whether they could personally negotiate the infant's ultimate release.

The state, in response, argues that the underlying premise of defendant's argument is wrong: There was no inducement or promise. According to the state, in light of the detectives' repeated clarifications about what they could and could not promise, defendant knew that he was not being offered anything in exchange for his confession. Thus, the state argues, defendant's claim of error "fails because it is

---

[2] ORS 136.425(1) provides that "[a] confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats."

[3] Article I, section 12, provides that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself."

based on the factually incorrect premise that the detective offered defendant a quid pro quo." In any event, the state argues, police deception is only one factor that should be considered under the totality of the circumstances. In the state's view, "the officers did not make any threats regarding defendant's child, and furthermore, the mere fact that the child was in state custody did not equate to a threat [of] the child's health and safety." Rather, "[d]efendant attempted to negotiate a deal for the release of his family, and the officers indicated that they could not make promises but would pass any information about his cooperation to the district attorney. That did not render defendant's confession involuntary."

## ANALYSIS

As noted at the outset, the Oregon Supreme Court's recent decision in *Jackson*, provides the framework for our analysis of the parties' competing arguments under Article I, section 12, and ORS 136.425(1). In *Jackson*, the court explained that "both the statute and Article I, section 12 embody the common-law rule that confessions made by a defendant in custody that were induced by the influence of hope or fear, applied by a public officer having the prisoner in his charge, are inadmissible against the defendant." 364 Or at 21 (internal quotation marks omitted); *see State v. Powell*, 352 Or 210, 218, 282 P3d 845 (2012) ("the statute encompasses the common law and thus applies to confessions induced by promises of leniency as well as by threats"); *State v. Wintzingerode*, 9 Or 153, 163 (1881) ("There seems to be no conflict among the numerous authorities as to the rule, that confessions made by a prisoner while in custody, and induced by the influence of hope or fear, applied by a public officer having the prisoner in his charge, are inadmissible in evidence against him."); *see also State v. Smith*, 301 Or 681, 690, 725 P2d 894 (1986) ("We know of no case that interprets or applies ORS 136.425 independently of the common-law rules on confessions and admissions.").

To protect a defendant's core statutory and constitutional right to be free from compelled self-incrimination, an out-of-court confession is presumed to be involuntary and, thus, inadmissible. *Jackson*, 364 Or at 21; *see also Powell*, 352 Or at 225-26 ("It is well established that confessions

are initially deemed to be involuntary and that the state has the burden to overcome that presumption by offering evidence affirmatively establishing that the confession was voluntary."). For a court to admit a defendant's out-of-court confession against the defendant at trial, the state bears the burden of proving that the confession was voluntary. *Id.* Thus, it is not defendant who must prove that his will was overborne. *Id.* at 21-22. Rather, the opposite—it is the state that must prove that "defendant's free will was *not* overborne and his capacity for self-determination was *not* critically impaired, and that he made his statements without inducement from fear or promises." *Jackson*, 364 Or at 22 (emphases added).[4]

　　　　One of the core rationales for this longstanding rule prohibiting the evidentiary use of confessions produced by inducements is to ensure that criminal convictions are based on reliable evidence and, accordingly, are themselves reliable: "'As our cases consistently have recognized, confessions are unreliable when rendered under circumstances in which the confessor perceives that he or she may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession.'" *Id.* at 23 (quoting *Powell*, 352 Or at 222).[5] Although "mere adjurations" to

　　　[4] That focus is the primary differentiator between the majority and the dissent. The dissent approaches this case by placing the burden, incorrectly, on defendant. As the dissent concludes, "It follows that, if the psychological pressure on a suspect is in place before the interrogation begins, and if a defendant nonetheless has the capacity to make a valid waiver of his *Miranda* rights, then the ordinary tactics of persuasion that police employ during the ensuing interrogation should not be a basis for concluding that defendant's capacity was lost. Under such circumstances, it should be harder—not easier—to show that a confession was caused by an unlawful police inducement." 301 Or App at 132 (Garrett, J. pro tempore, dissenting). But it is not defendant's burden to prove the confession was "caused by an unlawful police inducement." Rather, the confession is presumed involuntary. It is the state's burden to prove the confession was *not* the product of an unlawful inducement.

　　　[5] The dissent is concerned with whether an inducement existed before the police became involved. *See* 301 Or App at 119 (Garrett, J. pro tempore, dissenting) ("If that was the pressure that drove defendant to confess, then it is difficult to conclude that the confession was 'induced' by the police, as that pressure was being exerted on defendant *before* he met with the detectives." (Emphasis in original.)). The dissent's concern is misplaced.

　　In *Powell*, interpreting Oregon's statutory prohibition against involuntary confessions, the Oregon Supreme Court made clear that police inducement is not required:

tell the truth typically do not constitute inducements for purposes of this analysis, communications "that convey[] to a defendant the idea of a threat or a promise" do. *Id.* at 24 (relying on *Wintzingerode*, 9 Or at 163).

The court's decision in *Jackson* did not establish a hard-and-fast test for evaluating whether the state has met its burden in a given case. However, it did identify a useful approach, explaining that it is "helpful to begin with the issue of whether the officers who interrogated defendant induced him to make admissions by the influence of hope or fear." *Id.* at 22. If so, the next question is whether the state has demonstrated that, in view of the totality of the circumstances, the defendant's admissions were nonetheless the product of the defendant's free will. *Id.* at 27-28. The "totality of the circumstances" subject to examination includes the individual characteristics and circumstances of the defendant, in addition to the circumstances of the interrogation. *Id.* at 28. The ultimate question of whether the state has demonstrated that a confession was voluntary is one of law for the reviewing court, although an appellate court examining whether a confession was voluntary is bound by the implicit and explicit factual findings of the trial court, if those findings have evidentiary support. *Id.* at 21-22.

Applying that same approach here, we conclude that the state failed to demonstrate the voluntariness of defendant's confessions. As noted above, our review is circumscribed by the trial court's factual findings, two of which are particularly pertinent under the totality of these circumstances. The first is that defendant's IQ was 53. A score that low, courts have routinely observed, has been associated with mild mental retardation and significantly subaverage

---

"We decline the state's invitation to read ORS 136.425(1) to pertain only to confessions induced by and made to state actors. The text of the statute does not require that interpretation, our case law consistently has made no such distinction, and such a distinction would undermine the purpose of the statute. Consequently, we hold that ORS 136.425(1) continues to apply to confessions induced by and made to private parties."

352 Or at 222-23. Although *Jackson* primarily focuses on the voluntariness of confessions in a constitutional framework, *Jackson* appears to interpret Article I, section 12, and the statute congruently. Accordingly, the source of the inducement is immaterial. The question, rather, is whether the presence of an inducement renders the confession unreliable.

intellectual functioning. *State v. Agee*, 358 Or 325, 342, 364 P3d 971 (2015), *adh'd to as amended*, 358 Or 749, 370 P3d 476 (2016) (describing IQ range of 50-55 and approximately 70 (two standard deviations below normal) as mental retardation and significant subaverage intellectual functioning under the Fourth Edition (text revision) of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* 49 (4th ed Text Revision 2000)); *see also State v. Ryan*, 361 Or 602, 623, 396 P3d 867 (2017) (explaining that "the undisputed evidence at sentencing showed that defendant is an intellectually disabled offender who has an IQ score between 50 and 60, a full 10 to 20 points below the cutoff IQ score for the intellectual function prong of the intellectual disability definition recognized in *Hall* [*v. Florida*, 572 US 701, 719, 134 S Ct 1986, 188 L Ed 2d 1007 (2014)]"); *accord Atkins v. Virginia*, 536 US 304, 309 n 5, 122 S Ct 2242, 153 L Ed 2d 335 (2002) (observing that "an IQ between 70 and 75 or lower * * * is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition").

Although the trial court found that defendant's "limited IQ and lack of education did not impede his interaction with the detectives," that *factual* finding does not insulate defendant's IQ from consideration in the *legal* question of voluntariness. "In resolving the issue [of whether defendant's will was overborne at the time he confessed] all the circumstances attendant upon the confession must be taken into account." *Reck v. Pate*, 367 US 433, 440, 81 S Ct 1541, 6 L Ed 2d 948 (1961). That holistic approach was reinforced a generation later by the United States Supreme Court in *Oregon v. Elstad*, where the Court noted, "As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." 470 US 298, 318, 105 S Ct 1285, 84 L Ed 2d 222 (1985).

It is true that lower levels of intellectual functioning by a defendant do not, automatically of themselves, prohibit the state from meeting its burden to prove voluntariness. *State v. Hickam*, 71 Or App 471, 477, 692 P2d 672

(1984) (rejecting the defendant's argument that "because he is mentally retarded, his will to resist was overcome by the mere fact of the questioning itself"). However, it is well established that the personal characteristics of a defendant must be considered in assessing the totality of the circumstances surrounding voluntariness. *See, e.g., Reck*, 367 US at 443; *Clewis v. Texas*, 386 US 707, 712, 87 S Ct 1338, 18 L Ed 2d 423 (1967) ("petitioner's faculties were impaired by inadequate sleep and food, sickness, and long subjection to police custody with little or no contact with anyone other than police").

In this case, defendant's low IQ is a fact that is binding on us on appeal and one that *Jackson* unequivocally states must be considered in assessing whether defendant was susceptible to inducement, even if his interactions with police were not impeded. 364 Or at 30; *see State ex rel Juv. Dept. v. Deford*, 177 Or App 555, 572, 34 P3d 673 (2001) (stating that a defendant's personal characteristics, like age, education, and intelligence, "are relevant only if police, in fact, exert coercion and only insofar as those circumstances render a suspect less able to resist that coercion"); *accord Rhode Island v. Innis*, 446 US 291, 302 n 8, 100 S Ct 1682, 64 L Ed 2d 297 (1980) ("Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect."). Although the trial court found that defendant's IQ did not impede his interactions with police, whether someone is susceptible to coercion because of low intelligence or education is a different question from whether the person's intelligence is an impediment to communication.

The second factual finding of the trial court that informs our analysis is that defendant was, in fact, under the belief that his infant son was in custody and under the subjective belief that his cooperation would lead to his son's release. That is, regardless of how a father of average intellectual functioning would have responded to the possibility of an infant being in police custody, this particular

defendant, with an IQ of 53, understood the circumstances to involve urgency, including urgency over the child being breast fed by his mother.[6]

From the outset of the interrogation, it was readily apparent to detectives that defendant believed that police had taken his infant son from the child's nursing mother. Before agreeing to turn himself in, defendant told one of the detectives, "I want you to go leave the little boy with his mom because he's breast feeding." When a detective was asked what defendant's understanding of the situation was, he testified:

> "[PROSECUTOR]: Well, you first asked him, 'What do you think is your understanding of the situation?' Correct?
>
> "[GANETE]: Yes.
>
> "[PROSECUTOR]: And what was his response to that?
>
> "[GANETE]: 'Because he is a defenseless baby, you know, and then getting blamed for something I had nothing to do with.'"

Later in the interrogation defendant again pointed out that his baby was being detained but was still at an age that he needed to be breast fed. And, as the trial court found, "[t]he transcripts reflect over ten times in which the defendant referred expressly to his concerns about his son being in custody." While detectives did not create defendant's belief that his son was in custody, they affirmed, reinforced, and encouraged that mistaken belief.

With those factual findings from the trial court, we turn to the initial question identified in *Jackson*: whether

---

[6] Of note, the trial court also found defendant to be a Mexican citizen. The notion that the police would hold an infant in custody is not unrealistic. As the Ninth Circuit recently noted:

> "The State Department Human Rights Report on Mexico, while recognizing the national government's efforts to eliminate corruption and police entanglement with drug cartels, said that 'corruption remained a problem at all levels of government,' and some 'public officials continued to perpetrate . . . some criminal acts with impunity.' The State Department cited with approval reports that 'police, especially at the state and local level, were involved in kidnapping, extortion, and in providing protection for, or acting directly on behalf of, organized crime and drug traffickers.'"

*Barajas-Romero v. Lynch*, 846 F3d 351, 363-64 (9th Cir 2017) (ellipsis in original).

the detectives communicated inducements to defendant. As demonstrated by the previously quoted excerpts from the transcript of the interrogation, the answer to that question is yes. The detectives made many statements throughout the interrogation that communicated the idea of both threats and promises to defendant: the threat that, if he did not confess, his father, brother, and son would remain in custody and would "suffer," and the correlative promise that, if he did confess, it may well secure their release and prevent their suffering. The following are examples of what defendant was told after Ganete confirmed that defendant's father, brother, and son were, in Ganete's words, "in custody for now":

• "I don't want your family to *** suffer for something that I know you are responsible for."

• "You don't want to leave it like this—a mess. You—I believe your dad and your mom and your family don't deserve this, because everyone is suffering right now."

• "And I have another family *** suffering over their son, that they want their son to tell the truth so the family can have peace."

• "I can't let your family go until I find that body. And not until I get the truth from you. Because they are the only witnesses who can say what you told them."

• "They are in custody now because they know the information on this case and nobody but they knows the information. And until we can verify what they are telling us *** through you or through finding the body or both things *** and we have to have them in custody until we can verify."

• "And we know that it's very important that your dad and brother work because they are the ones who support the family and I know that's important to you and to the family. And that is the, the perspective of Detective LaMonica. He is the primary investigator in this case. Of course I am helping do the interviews in this case but, uh, let me say something. I know that what you're, uh, proposing and I know that you're doing this for your family."

• "Now the—for us it's, uh, as important for your family and for everyone that everyone knows—knows the truth.

You know that if the truth comes forward, all will be freed. \*\*\* [Y]our family will be free because like—to use your word—the hook in the case which is your dad and [brother] is not so critical because things come straight from your mouth. For you, it's having that personal freedom about what happened. Because this is something you can't live with in your heart your whole life. You can't live with this. Absolutely not. Absolutely not. You have to free yourself of that. The truth will solve this case for everyone. Like you asked me, as an officer what do I gain by this? I gain bringing peace to everyone, to the whole family, closing a case, you go on with your life, that family to have peace, your family to be able to go on living so that your child can get ahead, your wife can get ahead and we can fulfill—spread the benefit of the truth among everyone. And [defendant], only you have that key. Why kid ourselves? Here. It, it—I don't know how I can explain it any clearer than this."

• "Your family are cool people. \*\*\* [D]o you think I have the pleasure and I enjoy watching a family suffer? I don't think you think that of me because I've shown you I'm not that kind of person. To the contrary, I've constantly shown you that all of this is to benefit your family and everyone from all angles. So this is not something that, that, that the police take a great satisfaction in bringing trouble to your family and have them all suffer."

• "They [defendant's father and brother] told me but they didn't tell me everything. I know there's a part you didn't tell them. And that is the part you have that frees all, everyone. But that freedom, that decision is yours."

• "I don't want to see your family suffer any longer. I don't want to see that any, any longer. \*\*\* Because that's not right and you know that it's not right. Not for you or the other family, or for your mother or your father or no one. We have to stop the suffering. And you have to have peace in your heart."

• "[E]ach day we are not able to close this case in the sense of not knowing the details and how it all happened is one more day that your dad and [your brother] have to be in jail because we, we aren't able to free this. And of course the sooner we can free this case and come to the conclusion of what happened the sooner I can move this case forward[.]"

Those statements, as a whole, communicated to defendant that (1) three members of his family were in custody; (2) his entire family was suffering as a result; and (3) the key to securing the family members' release and ending the suffering was for defendant to confess to the murder. Those statements fall easily within the range of communications that bring ORS 136.425 and Article I, section 12, into play.

Constitutional protections against involuntary confessions protect against not only extreme methods of coercion, but also against the subtler techniques of interrogation that can be equally, if not more, effective at eroding the will. *See, e.g.*, *United States v. Tingle*, 658 F2d 1332, 1335 (9th Cir 1981) ("Law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear a rational intellect and a free will." (Internal quotation marks omitted.)). As the United States Supreme Court noted so powerfully in *Blackburn v. Alabama*, "coercion can be mental as well as physical, and [the] blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion.'" 361 US 199, 206, 80 S Ct 274, 4 L Ed 2d 242 (1960); *see also Malloy v. Hogan*, 378 US 1, 7, 84 S Ct 1489, 12 L Ed 2d 653 (1964) ("We have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." (Relying on *Haynes v. Washington*, 373 US 503, 83 S Ct 1336, 10 L Ed 2d 513 (1963).)).

As defendant observes—and courts have routinely recognized—appeals to parental and familial responsibility can be especially coercive. For example, in *State v. Ruiz-Piza*, 262 Or App 563, 325 P3d 802 (2014), we affirmed the trial court's suppression of a confession where police suggested that the defendant's daughter's serious medical issues could be ameliorated by a confession and effectively

told the defendant that a confession to accidentally shaking his daughter was the only way to avoid the police concluding that he had intentionally abused her. *Id.* at 574-76. We explained that the detective's representation that a confession would ameliorate the child's medical condition was "an assertion that, as a matter of medical fact, is without any support in the record." *Id.* at 574. We then stated that "the officers also appealed to defendant's paternal responsibilities, his religion, stated that defendant was the *only* one who could help G, and stated, in effect, that the way to provide that help was to tell the officers that he had accidently shaken her." *Id.* at 574-75 (emphasis in original). We concluded that "[t]hose statements, taken in the circumstances in which they were made, constituted an 'inducement through *** fear' that was specifically calculated to capitalize on what the trial court recognized as defendant's acute vulnerability." *Id.* at 575 (quoting *State v. Benton*, 92 Or App 685, 689, 759 P2d 332 (1988)).

In *State v. Hogeland*, 285 Or App 108, 395 P3d 960 (2017), we similarly observed that psychological pressure related to a defendant's family can render a confession involuntary. In that case, the detective "intimated that she would aggravate [the consequences of an abuse investigation] by taking defendant's child away from his wife—and from him—and placing the child with strangers." *Id.* at 120. We held that, "by implicitly promising defendant leniency, while simultaneously exploiting his vulnerabilities as a husband and a father, [the detectives] critically impaired defendant's capacity for self determination, such that his admissions cannot be considered 'the product of an essentially free, unconstrained, and informed choice[.]'" *Id.* at 121 (quoting *Ruiz-Piza*, 262 Or App at 573).

Federal courts have reached similar conclusions about the manifestly coercive effects of lying to a parent about the custodial circumstances of their children or a child's health and safety. For example, in *Lynumn v. Illinois*, the Court held that the defendant's confession was involuntary where three police officers and a convicted felon falsely told the defendant that, if she did not cooperate, she would lose custody of her infant children and state financial aid for

the children would be terminated. 372 US 528, 534, 83 S Ct 917, 9 L Ed 2d 922 (1963).

Following *Lynumn*, federal appellate courts have reasoned that, although police statements about family are not *per se* coercive, courts must, at the very least, "be particularly cognizant of the risk of coercion when reviewing interrogations where officers invoke references to a family member." *United States v. Hufstetler*, 782 F3d 19, 23 (1st Cir 2015). That is particularly true when an officer's statements appeal to a defendant's "primordial" parental instincts. *Id.* In *Tingle*, the Ninth Circuit highlighted the special relationship between parents and their children:

> "The relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit cooperation, they exert the improper influence[.]"

658 F2d at 1336 (internal quotation marks omitted); *accord Hufstetler*, 782 F3d at 22 ("[Officers'] use of a family member uniquely tugs at a suspect's emotions and thus can have an undue impact.").

Under the same rationale, the Ninth Circuit in *Brown v. Horell*, 644 F3d 969, 981 (9th Cir 2011), described the coercive nature of conditioning a defendant's ability to see his child's birth on his cooperation with authorities:

> "Rather than heed the warnings in *Haynes*, *Lynumn* and *Tingle* to tread cautiously around the subject of familial attachments, [the agent] 'deliberately prey[ed] upon,' *Tingle*, 658 F2d at 1336, [defendant's] expression of his overwhelming desire to witness his child's birth."

The case now before us involves a similar failure by police to "tread cautiously around the subject of familial attachments"—particularly, a parental relationship. Contrary to the state's position and the trial court's legal conclusion, the detectives' assertions in this case—including that they would "fight for" the release of defendant's family, including his infant, from police custody and that defendant could alleviate his family's suffering by confessing—were

inducements by hope and fear. The relationship between a parent and a child, in particular the protective role that a parent plays over a small child, especially an infant, touches at the deepest parts of the human psyche. The notion that a parent, when faced with imminent harm to their infant, would cling to any branch of hope no matter how slender, and do or say virtually anything to prevent that harm, needs no citation. It is an axiom of the human experience. And, contrary to the state's argument here, that is so regardless of whether the detectives also explained what they could *not* promise—the release from custody itself. As the court noted in *Jackson*, "[t]he hope of avoiding prosecution is not, however, the only inducement that may render a confession involuntary." 364 Or at 23.

In fact, the court long has held that much more indirect communications proposing that a confession could secure a benefit or avoid a harm are sufficient to trigger the protections of those provisions. In *Wintzingerode*, the court upheld the exclusion of a confession where the officer had told the defendant that "'[i]t would be better for you, Harry, to tell the whole thing.'" 9 Or at 162. Although those words did not communicate how, precisely, it would have been better for Harry to confess, the court reasoned that "[t]he precise form of words in which the inducement is presented to the prisoner's mind is immaterial. It is sufficient if they convey to him the idea of temporal benefit or disadvantage, and his confession follows in consequence of the hopes thereby excited." *Id.* at 163; *see also Powell*, 352 Or at 226-27.

Having concluded that the detectives communicated inducements to defendant, the remaining question under *Jackson* is whether the state's affirmative evidence is sufficient to demonstrate that, under the totality of the circumstances, defendant's will was not overborne by those inducements. We conclude that the evidence was not sufficient.

As was true in *Jackson*, this is a close case. On the one hand, the detectives made statements that qualified what they were offering defendant by telling him that they were not in the position to make promises to him. Defendant received *Miranda* warnings at the outset of the interrogation

and indicated that he understood that he did not have to speak to the detectives at all. The trial court found that, notwithstanding his low IQ and lack of education, defendant was able to comprehend the interview, which had been conducted in Spanish, a language in which defendant is fluent. All of this points to a conclusion that defendant's will was not overborne by the inducements offered.

On the other hand, the circumstances—both as defendant reasonably believed them to be based on the detectives' representations and as they actually were— as was the case in *Jackson*, "indicate that the detectives' methods and inducements may have persuaded defendant to tell the detectives what they wanted to hear, whether or not that was the truth." *Id.* at 32. The detectives communicated to defendant that his father, brother, and infant son were in custody because of defendant's conduct and were suffering because of it. They further communicated to defendant that the rest of his family was suffering because the family was dependent on his father and brother as wage earners, but they could not work to support the family while in custody. Defendant's family earned their living as migrant farmworkers, making the incapacitation of defendant's father and brother as workers a significant economic stressor for the family. Defendant's son was still breast feeding, increasing the need for him to be reunited with his mother. At the time of the interview, defendant had barely slept for three days. Time and again, defendant was told that his family members' freedom—something essential for the family's economic well-being—turned on defendant confessing. And, even though the detectives told defendant that they could not make any promises of particular results, their messages to defendant on that point were mixed. For example, Ganete explicitly stated to defendant that "I can't let your family go until I find that body. And not until I get the truth from you." Ganete's use of the phrase "I can't let your family go" communicated, in tension with some of the other representations to defendant, that he had some role to play in the release of defendant's family. Considering the totality of these circumstances, the state's case falls short of establishing that defendant's confession was voluntary.

In sum, the state had the burden to overcome the presumption that defendant's confession was involuntary by demonstrating that the confession was made without inducement through fear or promises, direct or implied. This record, in which detectives secured the confession of defendant—a person with an IQ of 53—when he believed that his infant was separated from the child's nursing mother and being detained by police, was repeatedly told that his family was suffering, and was told that his confession to murder was the key to securing the family members' release and ending that suffering, is not sufficient to demonstrate the absence of such inducement. The trial court erred in denying defendant's motion to suppress the confessions. Because the erroneous admission of the confessions was prejudicial (a point the state does not dispute), we reverse and remand his murder conviction.

Reversed and remanded.

**GARRETT, J. pro tempore,** dissenting.

After the victim's disappearance, defendant knew he needed to flee. He gathered his family members and drove to California, leaving them there while he continued on to Mexico. After family members were detained for questioning, *defendant* called the detectives; *he* broached the possibility of cooperating; and *he* chose to turn himself in at the U.S.-Mexico border. He met with the detectives, waived his *Miranda* rights (the validity of that waiver has never been challenged), and, after a "polite" interrogation, confessed to murder.

The question before us is whether that confession was voluntary. The Supreme Court's recent decision in *State v. Jackson*, 364 Or 1, 430 P3d 1067 (2018), provides an organizational approach for resolving that issue. First, we consider "whether the officers who interrogated [the] defendant induced him to make admissions by the influence of hope or fear"; second, if they did, we next ask whether other circumstances reflect that the defendant's admission was nonetheless the product of his free will. *Id.* at 22, 27-28.

As I will explain, the analysis in this case should end at the first step of the inquiry because the detectives

made nothing close to the sort of "inducement" that has led courts in past cases to conclude that police officers crossed the line. But even if we assume otherwise and proceed to the second step of the analysis, the record establishes that defendant made the confession of his own free will. The majority's contrary conclusion rests heavily on the supposed fact of defendant's low intelligence, but the record on that point is far more ambiguous than the majority opinion reflects. Viewing the record in the light consistent with the trial court's findings and conclusions, as we are required to do, the judgment should be affirmed.

         At the center of this case is the important fact that defendant believed that his family members, including his infant son, were in police custody and he hoped that, by confessing, he could help secure their release. If that was the pressure that drove defendant to confess, then it is difficult to conclude that the confession was "induced" by the police, as that pressure was being exerted on defendant *before* he met with the detectives. The pressure first arose, apparently, during a conversation that defendant had with his wife before he spoke to the police, as Ganete testified at the suppression hearing:

> "[PROSECUTOR]:   Detective Ganete, according to the defendant, what had [his wife] told him about what was going on?
>
> "[GANETE]:   So, [defendant] said that [she] had told him that they had detained his father and his brother and his son."

It was thus defendant who first introduced his fear for his family into the conversation with the detectives. Defendant called Ganete and expressed both his fear and hope that the police would release his family if he cooperated with the investigation:

> "[DEFENDANT]:   That's why I want to take care of it there. I, I don't want to say anything here because, because it doesn't make any sense to talk here, saying all things here. I want to take care of it personally.
>
> "[GANETE]:   Okay, when you—

"[DEFENDANT]: I want the little boy, the baby, I want him to be given to [his] mother.

"[GANETE]: When we—

"[DEFENDANT]: That's all I want.

"*****

"[DEFENDANT]: That's why I'm telling you, don't involve my family—don't involve them in [it] if you have problems with me."

Ganete later testified that the point of the call was that defendant "wanted to negotiate *** the release of his father, his brother, and his son."

During the interrogation, defendant continued to fixate on the detention of his family. The majority focuses on that concern but pays insufficient attention to the fact that it was defendant, not the detectives, who kept bringing it up. The trial court found that the "transcripts reflect over ten times in which the defendant referred expressly to his concerns about his son being in custody." Not long into the interrogation, defendant (not the detectives) first suggested the idea of confessing in exchange for the assured release of his family:

"[DEFENDANT]: I want to assure you of one thing. If you let my family go right now[,] I will tell you the truth. ***

"[GANETE]: You're telling me that if I—what you're telling me is if your dad and your brother get out of jail—

"[DEFENDANT]: And my son.

"[GANETE]: —and your son, you will tell me where the body is and everything that happened?

"[DEFENDANT]: Yes.

"[GANETE]: You will take me exactly to where it is, where, where you dumped the body.

"[DEFENDANT]: If you take me there to my family. I want to see that they are free and I will go with you."

Defendant made such offers repeatedly, and the trial court found that defendant "consistently tried to negotiate that he

would give a full statement regarding the incident in return for his family being released from custody." Meanwhile, the trial court found that the detectives "time after time told the defendant that they could not make such a deal," saying things like:

"[LAMONICA]:  * * * We cannot make you any promises, we're not allowed to.

"[GANETE]:  We can't make, make you promises because we—the law doesn't allow us to make promises.

"* * * * *

"[LAMONICA]:  I want to be sure you understand the position we are in. It's not that we don't want to understand your position, I mean, so that's not the case. I fully understand what you're telling me. As detectives we don't have * * * neither the responsibility nor the power under the law to make a deal with someone 'if you do this, I'll do that' and so on. What we can do is, uh, pass the information on to the person who makes the decisions on this case.

"* * * * *

"[GANETE]:  * * * I think that I've clearly explained our position to you, that my hands are tied to [a] certain point because I—we are detectives, we are not judges or district attorneys who take the cases and go to court and so on. And that is further ahead.

"* * * * *

"[GANETE]:  * * * I can't make promises to you, but I will tell you that I will fight as hard as I can to indicate in my report and to put in black and white that you were honest with me, you have told the truth, and that you've cooperated with the police[.]"

         The record thus shows that, in contrast to the usual fact patterns underlying our "involuntary confession" cases, the information that supposedly led defendant to be coerced—that his family members were in custody—was known to him before the interrogation began. That raises an obvious question: If defendant's confession was the result of coercive pressure, how much of that pressure was created by detectives during the interrogation, and how much did defendant carry into the room on his own?

One would think that we ought to consider that question in evaluating what causal role any police "inducements" played in defendant's decision to confess. Yet the majority does not engage with it.

Ganete and LaMonica did not say or do anything comparable to the sort of conduct that has heretofore been considered an unlawful inducement. Although the detectives did, to some extent, play along with defendant's hopes and fears (and, unsurprisingly, did not correct his misconception about his son[1]), the detectives never added to those pressures by, for example, asserting that other family members were being detained, or otherwise threatening to do something to the family except continue detaining them. In some instances, the detectives even mitigated some of those pressures; they repeatedly informed defendant that his "hope" of securing the immediate release of his family was unrealistic given the detectives' lack of authority to make such deals. *See State v. Evans*, 1 Or App 489, 495, 463 P2d 378, *rev den* (1970) (the defendant's independent choice to make a statement "in the hope or belief that it will exculpate or gain leniency for his wife or anyone else" did not render confession involuntary where police were clear that they could make no such promises).

---

[1] We have never held that police are required to correct misunderstandings or volunteer beneficial information to suspects during questioning. *See, e.g.*, *State v. Clifton*, 271 Or 177, 180-81, 531 P2d 256 (1975) (fact that the defendant independently attributed greater reliability to a polygraph than it deserved did not render his confession involuntary); *State v. Tobias*, 131 Or App 591, 595, 887 P2d 366 (1994) (the defendant's confession to abusing children was voluntary notwithstanding police's failure to disclose to [the] defendant that some children had denied abuse by the defendant); *State v. Harberts*, 109 Or App 533, 537, 820 P2d 1366 (1991), *aff'd as modified*, 315 Or 408, 848 P2d 1187 (1993) (officer's false "implied" expert qualifications in administering polygraph test, and failure to disclose the exact scope of qualifications, did not render the defendant's confession involuntary); *State v. Benepe*, 15 Or App 53, 58, 514 P2d 556 (1973), *rev den* (1974) (police not obligated to tell the defendant that the victim in a car accident had died and that the defendant was going to be charged with a crime); *Moran v. Burbine*, 475 US 412, 422, 106 S Ct 1135, 89 L Ed 2d 410 (1986) ("[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."); *cf. State v. Burdick*, 57 Or App 601, 606, 646 P2d 91 (1982) ("[P]olice trickery or false statements, alone, may not be sufficiently coercive to result in involuntariness."); *Frazier v. Cupp*, 394 US 731, 739, 89 S Ct 1420, 22 L Ed 2d 684 (1969) (lies or deception alone by the police generally do not render the defendant's statement inadmissible).

Oregon courts have long distinguished between permissible "adjuration" and impermissible "inducement." *See Jackson*, 364 Or at 24; *State v. Linn*, 179 Or 499, 510, 173 P2d 305 (1946). The difference is that "adjurations" will communicate to the defendant that, as a general matter, it would be better to tell the truth, or that he or she would feel better by telling the truth; "inducements," on the other hand, will communicate a threat or promise. *Jackson*, 364 Or at 24.

In this case, the detectives did very little. Ganete and LaMonica never promised to release defendant's family if he confessed (on the contrary, they repeatedly shut down defendant's attempts to elicit such a promise); they never promised defendant that he would be prosecuted more leniently if he confessed; they never threatened to do anything to defendant or his family if he did not confess; they never were hostile in their questioning (the transcript shows that they were, if anything, solicitous and, as the trial court found, "polite"). All the detectives did was affirm defendant's *pre-existing* understanding of the situation, encourage him to free himself and others of the emotional and spiritual burdens of his actions by confessing to them, and promise to convey his cooperation to the prosecutor.

The majority concludes that the detectives' comments fall "easily within the range" of communications that have been held to constitute inducement. 301 Or App at 113. That characterization is hard to square with *Jackson*, in which the Supreme Court considered significantly more hostile and threatening conduct by interrogating officers and still described that as a "close case." 364 Or at 31. The police in *Jackson* detained a mentally and physically disabled suspect overnight; they prohibited him from contacting family members on whom he regularly depended; they engaged in intense and combative questioning; and they made specific threats and promises about how the case against him would proceed, including that, if he did not confess, they would charge him with other murders and work to ensure that he received a harsh sentence. *Id.* at 25.

In comparison, Ganete's and LaMonica's conduct was positively mild. The majority observes that the detectives

made remarks that defendant's family was "suffering," which, according to the majority, constituted a "threat" that the family would "remain in custody and would 'suffer'" if defendant failed to confess. 301 Or App at 111. But, in context, the detectives' nonspecific remarks that defendant's family was "suffering" carried no implicit suggestion that police would make things worse for the family, legally or otherwise, or that the police would change the "natural consequences" of the situation if defendant failed to confess. On the contrary, the detectives made only "adjurations" by encouraging defendant to do the moral thing: recognize how his actions had burdened his family and lift those burdens by owning up to what he had done. *Cf. Jackson*, 364 Or at 27 (police comments were to the effect that "it wasn't just that the *natural consequence* [of the defendant's refusal to cooperate] would be a certain thing, but [instead that] *the police would actively work to make things as bad as possible for him"* (emphases added)).

Nor, in light of our case law, did the detectives cross the line by suggesting to defendant that his cooperation could increase the chances of his family members' release. That is so for a couple of reasons.

For one, we have generally held that assurances by police that they will report a defendant's cooperation to the prosecutor are permissible, as opposed to promises of immunity or leniency, which render confessions involuntary. *Compare State v. Williams*, 64 Or App 448, 455, 668 P2d 1236, *rev den*, 296 Or 120 (1983) ("[T]he officers agreed only to forward [the] defendant's request to the officials with authority to 'deal' with him. *** [W]hile [the] defendant may have felt impelled by his desire not to disappoint his brother, the only 'promise' made to [the] defendant by the police was a promise to convey a request—a promise made without any effort by the officers to make that conveyance contingent on anything."), *and State v. Morris*, 248 Or 480, 482-83, 435 P2d 1018 (1967) ("[N]o promises of benefit or hope of benefit were held out to the defendant to obtain his confession. The officers merely agreed to make known his desires to the district attorney, and this was done."), *with State v. Aguilar*, 133 Or App 304, 307-09, 891 P2d 668 (1995) (police promises

of leniency or immunity for the crime to which a defendant confesses are involuntary "as a matter of law" because "[i]t is assumed that when a person confesses in response to a promise that the person will not be charged with the crime for which the confession is made, the person's confession is not the product of an essentially free and unconstrained choice").

As for Ganete's and LaMonica's suggestion that defendant's cooperation *might* cause the prosecutor to look favorably on the prospect of releasing the family members, the speculative and contingent quality of that suggestion makes it unlike the sorts of promises and threats that have been held to render confessions involuntary. For example, the statements here are nothing like those in *Jackson*, where the police assured (or threatened) that, if the defendant did not confess, the police would charge him with other murders and "do everything they could to ensure that [the defendant] received a harsh sentence." 364 Or at 25. Nor do they compare to the statements made to the defendant in *State v. Hogeland*, 285 Or App 108, 111, 395 P3d 960 (2017), where an officer told the defendant, "I'm going to have to put [your infant] in stranger foster care" if the defendant did not confess, or to the defendant in *State v. Ruiz-Piza*, 262 Or App 563, 569-70, 325 P3d 802 (2014), in which the defendant was accused of shaking his baby, and the police told the defendant that his child was going to die or go blind unless the defendant confessed and provided information that would help doctors ameliorate the child's condition.

In short, I disagree that the comments cited by the majority rose to the level of "inducement" capable of causing defendant to confess involuntarily. *See State v. Powell*, 352 Or 210, 222, 282 P3d 845 (2012); *State v. Hickam*, 71 Or App 471, 477, 692 P2d 672 (1984) (involuntary confessions occur where coercive circumstances are "sufficient in their totality to overcome defendant's will to resist"). Because the detectives made no improper inducement at all, I would find it unnecessary to proceed to the second step of the *Jackson* analysis, which is to consider whether, notwithstanding any inducement, the totality of the circumstances indicates that defendant's confession was nonetheless voluntary. However,

consideration of that second question further supports the trial court's conclusion that defendant acted voluntarily.

Defendant's conduct and demeanor both before and during the interrogation strongly indicate that he was acting of his own free will. Defendant became involved in the investigation not because the detectives contacted him, but rather because *he* reached out to Ganete and LaMonica at his own initiative, evidencing his willingness from the start to engage with the detectives about the case. Defendant then left Colonet, Mexico, traveled north through Ensenada and Tijuana, and turned himself in at the California border. That sequence of events gave defendant plenty of time to consider his options.

When the interrogation began, defendant waived his *Miranda* rights, and no one contends that defendant's *Miranda* waiver was anything less than fully informed and valid. As I will explain further below, defendant's valid *Miranda* waiver is an especially strong indication that his conduct during the ensuing interrogation was voluntary. *See Jackson*, 364 Or at 21 (provision of *Miranda* warnings weighs in favor of voluntariness); *State v. McAnulty*, 356 Or 432, 459, 338 P3d 653 (2014), *cert den*, ___ US ___, 136 S Ct 34 (2015) (the defendant's confession was voluntary where it followed a valid *Miranda* waiver and where the defendant initiated the interrogation herself); *State v. Rodriguez-Moreno*, 273 Or App 627, 638-39, 359 P3d 532 (2015), *rev den*, 358 Or 611 (2016) (provision of *Miranda* warnings generally weighs in favor of voluntariness); *see also Berkemer v. McCarty*, 468 US 420, 433 n 20, 104 S Ct 3138, 82 L Ed 2d 317 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.").

At numerous points in the interrogation, after waiving his *Miranda* rights, defendant drove the conversation. He tried repeatedly to propose deals on his own terms, which suggests that he was exercising free will in choosing whether, and under what circumstances, he was prepared to confess. In addition, defendant, rather than rushing to sacrifice himself for his family members, selectively withheld

and disclosed information, sometimes revealing information only after he was sure that the detectives already knew about it, thus leveraging his own knowledge to figure out what the police knew. (Ganete described the interview as a "chess match" because of the way defendant selectively withheld and disclosed information piecemeal throughout the interview.)

Defendant also challenged various assertions that the detectives made. At some points, defendant asked them to show him proof of their evidence, including evidence relating to the location of the victim's cell phone and the tape-recorded interviews of his father and brother. Defendant later called out the detectives' attempts to use his family as leverage:

"[GANETE]:  *** [W]hat we know is that your dad and your brother are key witnesses in this case. And they are less key if we validate the information they gave us through you. That means that if you tell me exactly what happened and tell me exactly where, where I can find [the victim], then they aren't so critical to this case because it comes straight from you. But if I don't hear anything out of your mouth, nothing comes from you, they are the key people who can say.

"[DEFENDANT]:  The little hook.

"* * * * *

"[GANETE]:  They are the hooks of the case. And the way you release that hook is if you take the responsibility of saying, 'well, uh, I'll tell what it is, I'll tell you what happened' and his testimony, theirs, won't have the same value as your testimony, and that's why the hook, that hook's not to—

"[DEFENDANT]:  Also to pull me.

"[GANETE]:  Yes. Exactly."

Finally, other general considerations indicate that defendant was not coerced: the detectives were never hostile toward defendant and, as the trial court found, "[t]he interview was polite in tone throughout"; the detectives gave defendant opportunities for breaks, including to use the bathroom; the interrogation was relatively short in length,

lasting only about two hours and 15 minutes; defendant was sober and lucid throughout the interrogation.[2]

Compare all those circumstances to *Jackson*. In that case, police officers collected the defendant and brought him to the interrogation without giving him any information about what they wanted to talk about; the defendant did not know he was being accused of murder until that subject arose during the interrogation. *Jackson*, 364 Or at 4. The police officers (not the defendant) drove the conversation—the defendant, meanwhile, did not try to propose deals or leverage his own knowledge against the police, but rather asserted that he could not remember what happened and was trying his best to remember (which, as discussed more below, may have been difficult for him because of his history of drug use, memory problems, and blackouts). *Id.* at 15. The interrogation in *Jackson* lasted for over 10 hours, over the course of two days (eight hours on the first day), and the tone was "intense" and "hostile" at several points. *Id.* at 31. When the police detained the defendant overnight, they forbade him from contacting his family members on whom he regularly depended due to his mental and physical health issues. *Id.* at 31-32.

This case is nothing like *Jackson*, with the exception that this defendant, too, is asserted to have a mental disability. The majority relies heavily on that aspect of the record; after stating that it is bound by the trial court's "finding" that defendant has an IQ of 54, 301 Or App at 109, the majority proceeds to explain why that fact supports the conclusion that defendant's will was overborne.

The majority's treatment of the factual record is questionable. The trial court did make a finding that defendant has an IQ of 53, but there is more to the story. In an aid-and-assist hearing before the suppression hearing, the trial court determined that defendant was malingering mental illness to avoid legal responsibility and stay in the

---

[2] Specifically, the trial court found that defendant "was not suffering any psychosis during his interactions with the detectives. Although the defendant had slept little in the proceeding [*sic*] days, he did not manifest any drowsiness during the interrogation. The defendant was not under the influence of any intoxicants." The trial court also found that "[t]here were no communication problems" during the interrogation.

hospital rather than returning to jail. The court's findings were based in part on defendant's two admissions to "faking" misunderstanding what was told to him. One of the doctors who examined defendant also testified that she believed that defendant intentionally underperformed on the IQ test and that she did not think that the test results were a "true measure of his IQ." Other doctors apparently suspected that defendant was malingering and had seen defendant's demeanor change upon his noticing that doctors were present, leading one doctor to suspect that defendant was "putting on an act" for the doctors.

Those facts were before the trial court at the time that it ruled on the question of voluntariness. It is true that the trial court did not expressly make findings casting doubt on the validity of defendant's IQ test. However, as a reviewing court, we are required to view the facts in the light consistent with the trial court's ultimate conclusion, and, when in doubt, to assume that the trial court resolved factual issues in a manner consistent with its ultimate conclusion of voluntariness. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). In light of the trial court's ultimate conclusion that defendant acted voluntarily and its findings that defendant's interactions with the detectives were not impaired, we should presume that the trial court did not view the bare fact of defendant's IQ test result as dispositive of defendant's mental abilities, in the face of countervailing evidence that suggested very different things about those abilities. The majority, however, ignores that other evidence, focusing entirely on the test result. If any legal authority requires that approach, the majority does not cite it.

A defendant's personal characteristics are relevant to voluntariness "only if police, in fact, exert coercion and only insofar *as those circumstances render a suspect less able to resist that coercion.*" *State ex rel Juv. Dept. v. Deford*, 177 Or App 555, 572, 34 P3d 673 (2001) (emphasis added). Here, assuming that defendant has below-average intelligence, it is notable that the majority never identifies exactly *how* that affected his conduct. That conduct supports the trial court's finding that defendant was not impeded; rather, he entered the interrogation room with a view to securing the best deal

that he could get, and the interrogation was essentially a negotiation.

By giving decisive weight to defendant's IQ score in the face of evidence about how he actually conducted himself, the majority departs from how we have treated defendants' personal characteristics in past cases. We have looked beyond general assertions regarding a defendant's level of mental competence and evaluated the record for indications of actual impairment in the interactions between the defendant and the police. *See, e.g.*, *State v. Davis*, 98 Or App 752, 754-55, 780 P2d 807 (1989), *rev den*, 309 Or 333, *cert den*, 498 US 827 (1990) (the defendant's confessions were voluntary, notwithstanding his "low maturity and intelligence levels"; concluding that "[t]he trial court's reliance on [the] defendant's 'dull normal' intelligence was *** misplaced" because "[t]here is nothing in the record to show that [the] defendant was unaware of what was happening" and "[t]he record illustrates that he was able to comprehend the questions asked and to respond as he saw fit"); *Hickam*, 71 Or App at 477-78 ("Implicit also in the conclusion of voluntariness is the finding that, despite his retardation, [the] defendant was able to comprehend the questions asked and to respond as he saw fit."); *see also State v. Vu*, 307 Or 419, 425, 770 P2d 577 (1989) (rejecting the defendant's argument that "cultural differences" and "lack of English language skills" made his confession involuntary, where the defendant did "not contend that the cultural differences coerced him into making the false statement or that he misunderstood the question because of his poor language skills").[3]

---

[3] *Jackson*, in contrast, is a case in which the defendant's personal characteristics put him at specific disadvantages in his interactions with police. The defendant in *Jackson* suffered from, among other things, schizophrenia and depression, which made defendant more reliant on daily assistance from family members as well as a live-in care provider; he also had high blood pressure and was generally in poor physical health. 364 Or at 29, 32. The police officers' techniques exploited those weaknesses: The interrogation was both "physically and mentally demanding," lasting for over 10 hours and becoming "intense" and "hostile" at various points. The police also detained the defendant overnight and did not let the defendant contact the family members on whom he regularly depended, despite his multiple requests to do so, and the police encouraged him to see confession as a means of ending the interrogation. *Id.* at 29, 32. Further, the defendant in *Jackson* suffered from memory loss and blackouts, which was significant given that the murders that the defendant was being accused of committing had occurred several decades earlier, thereby making it all the more difficult for the defendant to defend himself. *Id.* at 31-32.

For the foregoing reasons, I would conclude that the detectives in this case made no improper "inducements" and that, in all events, the record supports the trial court's conclusion that defendant's free will was not overborne and his capacity for self-determination was not critically impaired. Under the totality of circumstances, defendant's confession was voluntary.

I conclude with an observation. As already noted, to the extent that defendant was under coercive pressure at the time that he confessed, that pressure came into being before the interrogation ever began. The critical piece of information—that defendant's family members were in custody—is not a fact that the detectives imparted to defendant; he came to that understanding on his own (which is why he surrendered), and he fully understood the situation (albeit with some incorrect factual information) at the time that he waived his *Miranda* rights. That fact appears not to weigh in the majority's analysis, but it should.

The United States Supreme Court has explained that "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer*, 468 US at 433 n 20. The Oregon Supreme Court has also recognized that *Miranda* plays a role here. *See, e.g.*, *Jackson*, 364 Or at 21 (the provision of *Miranda* warnings weighs in favor of voluntariness, even if it is not necessarily an outright "guarantee" of voluntariness); *McAnulty*, 356 Or at 459 (the defendant's confession was voluntary where it followed a valid *Miranda* waiver and where the defendant initiated the interrogation herself).

Though Oregon courts have acknowledged the importance of a *Miranda* waiver in this particular context, little appears to have been said about it.

The purpose of reading *Miranda* rights is to counteract the inherently compelling atmosphere of an in-custody police interrogation by empowering the suspect with the knowledge that he or she can, in a certain sense, level the playing field by exercising certain rights. *Miranda v. Arizona*, 384 US 436, 468-70, 86 S Ct 1602, 16 L Ed 2d

694 (1966). When a suspect voluntarily declines to exercise those rights, he or she chooses to proceed knowing that the circumstances are inherently coercive. Thus, police tactics that are calculated to persuade a suspect to confess are not generally impermissible; nothing less than an inherently coercive atmosphere is to be expected.

The reason that a valid *Miranda* waiver cannot be dispositive of voluntariness, of course, is that, even if a person has the capacity to execute such a waiver before the interrogation begins, police might do something after that point to impair the person's capacity for self-determination. For example, they might beat him. Impairment can also result from psychological pressure, such as where police inform a suspect that his baby is in critical medical condition and that the baby's life may depend on the suspect's providing information immediately. *See Ruiz-Piza*, 262 Or App at 572-75.

However, because a person who waives his *Miranda* rights is presumed to know that he is walking into the lion's den, the threshold for finding psychological pressure to be *impermissibly* coercive must necessarily be high.[4] That is why mere "adjuration"—psychological pressure to "do the right thing"—has never been deemed to be improper. It follows that, if the psychological pressure on a suspect is in place before the interrogation begins, and if a defendant nonetheless has the capacity to make a valid waiver of his *Miranda* rights, then the ordinary tactics of persuasion that police employ during the ensuing interrogation should not be a basis for concluding that defendant's capacity was lost. Under such circumstances, it should be harder—not easier—to show that a confession was caused by an unlawful police inducement.[5] By finding unlawful inducement in

---

[4] One of the implications of this is that pre-*Miranda* cases on the subject of involuntary confessions may be of limited value. For example, although the Supreme Court concluded more than a century ago that police induced a defendant to confess by saying, "[i]t would be better for you, Harry, to tell the whole thing," *see State v. Wintzingerode*, 9 Or 153, 162 (1881), it is questionable whether that case, if decided after *Miranda*, would have come out the same way.

[5] The majority interprets this observation to be incorrectly assigning the burden to defendant to prove that his confession was involuntary. 301 Or App at 106 n 4. I agree that the converse is true; the state must prove that the confession was voluntary. However, the point is largely academic; notwithstanding how

these circumstances, based on such relatively innocuous police conduct, the majority's decision has the opposite effect.

I respectfully dissent.

Armstrong, DeVore, Tookey and Powers, JJ., and Hadlock, J. pro tempore, join in the dissent.

---

cases have described the allocation of the burden of proof, they make clear that the state's burden is satisfied unless the evidence shows an improper inducement sufficient to have caused a person to act involuntarily. That bar is a high one, and it should not be lowered because a defendant happens to be under pressure before an interrogation begins.