No. 72          February 7, 2024          545

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSHUA TERRELL GREEN McCOMBS,
*Defendant-Appellant.*

Klamath County Circuit Court
16CR01356; A175889

Andrea M. Janney, Judge.

Submitted April 24, 2023.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Stephanie J. Hortsch, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Michael A. Casper, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Conviction on Count 3 reversed; remanded for resentencing; otherwise affirmed.

**ORTEGA, P. J.**

Defendant appeals his conviction by a jury for first-degree rape, ORS 163.375(1)(b) (Count 1); first-degree sodomy, ORS 163.405(1)(b) (Count 2); and first-degree sexual penetration, ORS 163.411(1)(b) (Count 3). He assigns six errors, challenging the denial of his motion for a judgment of acquittal (MJOA) on Counts 1 and 3, the denial of his motion to suppress his statements confessing to the conduct underlying those convictions, and the imposition of 300-month prison sentences and 100-year post-prison supervision (PPS) terms on each of the three counts.[1] We conclude that the evidence supported the denial of his MJOA as to Count 1, that his inculpatory statements were correctly admitted, and that his sentence on Counts 1 and 2 were not constitutionally disproportionate. However, we conclude that the trial court erred in denying defendant's MJOA on Count 3, because the evidence was legally insufficient to corroborate his inculpatory statements that supported the sexual penetration conviction. Accordingly, we reverse defendant's conviction on Count 3; otherwise, we affirm the court's judgment.

We begin by providing the principal facts on which we base our decision and provide additional relevant facts as we address each issue. Detective Ferns interviewed defendant in connection to allegations that defendant had sexually abused his four-year-old stepdaughter, H, after H told her mother, "[D]addy hurt [my] butt with his wee-wee."[2] Defendant initially denied that he had touched H inappropriately. Ferns told defendant,"[I]f something did happen between you and your daughter, I'm going downstairs and you're leaving this room"; "I will not arrest you"; "[T]he truth always comes out"; and "If people lie to me ***, I paint them out to be liars in my report." Defendant stated, "I did not

---

[1] The trial court's judgment indicates that each of defendant's sentences included a PPS term of "100 year(s)." The text of the applicable statute, ORS 144.103(2), however, indicates that the PPS term shall be "for the rest of the person's life." Defendant points out that error, but he expressly concedes that the error was harmless, and we agree. We, thus, review defendant's challenge to his PPS terms, as he presents it, as a challenge to the imposition of a lifetime PPS term against him.

[2] H was about two months old when defendant and H's mother began their relationship, and H referred to defendant as "daddy."

touch her with my penis"; "I might have rubbed harshly when I was cleaning, but the poop wouldn't come off." In response to whether his finger "entered the cavity of [H]'s anus," defendant replied, "[M]y finger might have entered [H] *** once." Defendant explained that he was helping H with a bath, that "the soap was really slippery" and "it just happened," and that he made a mistake. Ferns replied, "I can tell on your face it was intentional" and "If this is true, *** let's *** get you some help on it." Defendant continued to deny that he acted intentionally.

As the interview proceeded, Ferns said, "I think you stuck your finger in your daughter's ass on purpose," and defendant relented, stating, "I did, sir." He explained that he put his "middle finger *** [a]ll the way" up H's anus for "[m]aybe two [or] three minutes," on purpose, more than once, but no "more than five times." Moreover, defendant stated that he "put" his penis in H's anus "[n]ot all the way." He explained, "I put it in, and then she started screaming really bad. I pulled it out and instantly left the [bath]room." Defendant further explained that he used baby oil as a lubricant and that he did not use a condom. Ferns asked defendant to write an apology letter, describing "in detail what [defendant] did" to H, and defendant did so. After defendant wrote the apology letter, Ferns told defendant (falsely), "Your daughter had a tear on her vagina. What's going on about that?" Defendant replied, "I never tried to insert it into there. *** I pushed it there, but I couldn't." Defendant also stated that he did not know how far his penis went into H's vagina and that "[m]aybe" it was "an inch, if that." At the end of the interview, defendant stated, "I'm not glad that I did it"; "I'm glad that I told you the truth"; "There's no help for this"; and "Tell [H] I'm sorry."

The state indicted defendant with first-degree rape, ORS 163.375(1)(b) (Count 1), alleging that defendant "engage[d] in sexual intercourse" with H; first-degree sodomy, ORS 163.405(1)(b) (Count 2), alleging that defendant "engage[d] in deviate sexual intercourse" with H; and first-degree sexual penetration, ORS 163.411(1)(b) (Count 3),

alleging that defendant "penetrate[d]" H's anus with defendant's finger.[3]

Before trial, defendant moved to suppress his statements to Ferns, arguing that they were not voluntary and were, rather, coerced. He explained that he suffered from post-traumatic stress disorder (PTSD) and argued that Ferns misled him during the interview as to injuries to H's genitals and by promising to help him and informing him that he would not be arrested if he admitted the alleged conduct. Two expert witnesses—clinical psychologist Dr. Calvo and neuropsychologist Dr. Stanulis—testified for defendant, opining that defendant's undisputed PTSD put him at risk of making false and involuntary statements. Ferns testified that, having interviewed "several hundred" people, he had noticed nothing "out of the ordinary mentally going on with" defendant, including no changes in defendant's demeanor. The trial court denied defendant's motion in a detailed opinion letter that found, based on Ferns's testimony during the suppression hearing and the recording of Ferns's interview with defendant, that defendant made his statements during the interview voluntarily. As the court explained,

> "[D]efendant has a valid PTSD diagnosis [and] there may be circumstances or instances when an otherwise benign interrogation or interview could become coercive due to an individual's acute PTSD reaction.

> "[Here,] [h]owever, there is no evidence that *** defendant was exhibiting any signs of severe anxiety or distress that would have been out of the ordinary for this situation. *** Ferns testified that *** defendant was behaving in ways that were consistent with many defendants he had interviewed before. [Ferns] did not notice any physiological responses in *** defendant that alerted him to any significant issues."

The court further found that Calvo and Stanulis, the two expert witnesses who testified to the opinion that

---

[3] "A person who has sexual intercourse with another person [who is under 12 years of age] commits" first-degree rape. ORS 163.375. "A person who engages in oral or anal sexual intercourse with another person [who is under 12 years of age] commits" first-degree sodomy. ORS 163.405. "[A] person [who] penetrates the vagina [or] anus" of another person who is under 12 years of age "with any object" commits the crime of first-degree unlawful sexual penetration. ORS 163.411.

defendant suffered from PTSD and involuntarily confessed, were neither credible nor persuasive. The court explained:

"The court *** acknowledges the very real phenomena of false confessions. *** Dr. Calvo[] testified that he believed [defendant's] confession to be false because *** defendant suffers from guilt due to actions in combat. Specifically, Dr. Calvo testified that *** defendant was likely confessing to this charged crime out of guilt for having shot a child during the war. There is absolutely no evidence on the record to suggest this is anything other than pure speculation. Dr. Calvo frequently contradicted himself and had to be routinely redirected by counsel. For example, Dr. Calvo testified that it is very common for veterans with PTSD to exhibit a mistrust and disdain for authority. [D]efendant *** was respectful and compliant with authority. When carefully redirected by defense counsel, Dr. Calvo testified that *** defendant's deference to authority during the interview could certainly be a 'result' of PTSD. Overall, the court did not find Dr. Calvo's testimony to be credible.

"Further, Dr. Stanulis'[s] opinion is not persuasive. His report reads as little more than a cursory critique of the interview, while citing wholly unreliable sources. His testimony was also contradictory. When confronted with conflicting information or difficult questions, he became evasive and non-responsive. Neither expert could identify behaviors or actions by *** defendant during the interview that could be identified as symptoms of PTSD. Dr. Calvo cited *** defendant's politeness as evidence of PTSD, while Dr. Stanulis mentioned that *** defendant almost vomited and was compliant. When pushed, neither witness could articulate why *** defendant's PTSD made this confession involuntary. Dr. Stanulis relied heavily on his belief that the interview itself was coercive and that [defendant] would be especially vulnerable to that type of interview. Overall, the testimony of Dr. Stanulis was not particularly credible or compelling."

Moreover, the court found that defendant "willingly went to the police station to be interviewed"; that he "was advised of his *Miranda* rights and signed an acknowledgement that he understood those rights"; that "[t]here [wa]s no evidence on the record that he did not understand his *Miranda* rights, or that his PTSD rendered him unable to understand his rights" and "no indication of confusion on

behalf of \*\*\* defendant." The court further found that the interview was a "one-on-one interview that lasted less than one hour," that it "occurred in the middle of the day," and that "defendant was never threatened, restrained, or told he could not leave."

Regarding Ferns's statement, "I'll go upstairs,[4] and you'll go home," the court, based on *State v. Vasquez-Santiago*, 301 Or App 90, 456 P3d 270 (2019),[5] explained:

"Th[at] [statement] triggers an inquiry about whether inducement overborne the defendant's free will. [However,] [h]ere, there were no promises that a confession could secure a benefit or avoid a harm. [Defendant] was encouraged to tell the truth. \*\*\* Unlike *Vasquez-Santiago*, there were no direct or implied promises regarding the state's action towards the defendant. \*\*\* Ferns did not promise or threaten the defendant in any way \*\*\*. Ferns did not promise or threaten any leniency or harsh treatment. [D]efendant specifically asked \*\*\* Ferns what was going to happen, and \*\*\* Ferns replied, 'I don't know.' At one-point \*\*\* Ferns did push defendant to tell the truth and told [defendant] he believed [defendant] was only being 'partially truthful.' \*\*\* Ferns admitted to lying to [defendant] about an injury to [H]. Lying to a defendant is not prohibited. The deception in this case was not 'beyond that pale' as defense counsel argues."

The court continued:

"Further, the defendant did not confess to every act he was questioned about. [Defendant] confessed to only certain acts, even when pressed by [Ferns] regarding other victims, locations, and facts. [D]efendant corrected [Ferns] on more than one occasion about the nature of his conduct, of where the incident occurred. While alone, [defendant] wrote his confession which matched his verbal statement.

---

[4] At the interview with defendant, Ferns used the word "downstairs" but, when testifying, he used the word "upstairs." The court appears to be referring to Ferns's testimony. That word variation does not affect our analysis as it is clear in the record that Ferns was referring to the same place both times.

[5] In *Vasquez-Santiago*, the defendant's confession was held to be involuntary because the detectives secured that confession by making the defendant "believe[] that his infant was separated from the child's nursing mother and was being detained by police," by "repeatedly" telling him "that his family was suffering" and "that his confession to murder was the key to securing [his] family members' release and ending that suffering." 301 Or App at 118.

[Defendant] repeatedly apologized for his behavior and expressed relief in telling the truth. \*\*\* The court does take \*\*\* defendant's diagnosis and level of disability into consideration under the totality of the circumstances \*\*\* [and] finds that [defendant] was not overcome by his disability to the point of involuntarily confessing. [Defendant] was not induced to confess through fear or promises, direct or implied.

"The motion [to suppress] is denied."

At defendant's trial, the state played the audio recording of defendant's interview with Ferns and introduced, among other evidence, defendant's apology letter to the jury. Ferns and several other witnesses testified for the state, including H's mother, H, and other individuals who corroborated that H had asserted that "[defendant] hurt [her] butt with his pee-pee." In addition to testifying to H's statement, H's mother confirmed that there was baby oil in their house—in reference to defendant's statement that he used baby oil as a lubricant.

Child Abuse Response and Evaluation Services (CARES) medical director, Laneah Snyder, who evaluated H, performed a head-to-toe examination of H, and participated in H's forensic interview, testified that when she asked H about her vaginal area, H replied that "Daddy made a mark with his wee-wee," when H was in "[m]ommy's room." When asked about how many times "Daddy made a mark with his wee-wee," H replied, "Hours." According to Snyder, that response reflected the time concepts of a four-year-old child. Snyder testified that H's video colposcopy showed "a little bit of redness" "in front of" H's hymen, though she also acknowledged that "a bit of redness" can be "very normal" in a four-year-old. Snyder explained that "normal" is a common physical finding following child abuse.

Snyder further testified that in reply to questions about H's anus area—including, "Has anybody ever made you do anything to their butt that's made you feel weird or icky or not right?"—H replied, "Daddy did" and "He put his wee-wee in my butt"; when asked, "Where is his wee-wee?" H replied, "In his pants"; when asked about where that happened, H replied, "At the house," in the "TV room and [in]

mommy's room one time." Snyder testified that she found no additional physical findings and that H's "anal exam was with the normal limits." Asked whether she would "expect *** to see physical findings [from where] the defendant used his finger, put his penis in her rectum using baby oil one time," Snyder replied, "never." Specifically, Snyder explained, "[You] are even less likely to see anal findings in abuse than you are *** in vaginal findings."

CARES forensic interviewer, Andrea Mitchell, who interviewed H after Snyder's examination and with Snyder, testified that H told Mitchell, "Daddy's wee-wee hurt my butt." Like Snyder, Mitchell testified that H said that the incident occurred "[i]n mommy's room" and that "daddy's wee-wee" was "[i]n his pants," which H demonstrated that by "point[ing] to [H's] front private." Mitchell also testified that H said that "daddy" took H's pants and underwear off when they were in the bathroom; when asked whether "daddy's wee-wee ever hurt [H] anywhere else," H replied, "No." After a break in the interview, Mitchell asked H to draw a picture of defendant's "wee-wee" and H drew a picture of an "awkward-shaped circle, kind of long with a point on it." At that point, the state introduced H's drawing into evidence. Mitchell also testified that, when asked to clarify where and how defendant's conduct happened, H said that "she was in the room *** [o]n the bed" and that H demonstrated defendant's position by "l[ying] facedown with her knees tucked under her stomach" and said, "Daddy was on my butt." H confirmed to Mitchell that she told "the doctor last night" and told her "mommy" about "daddy's wee-wee hurting her butt." Mitchell confirmed that in her interview with H, H made no mention of whether defendant "put anything in [H's] vagina" or whether "a finger [had] be[en] put in her butt."

Ferns, who observed Snyder's evaluation and Mitchell's interview with H, testified that the next day, he contacted defendant to request an interview, and that he explained to defendant upon that contact that the interview concerned H, and defendant agreed to go to the Police Department to be interviewed. About seven minutes later, defendant arrived at the Police Department, Ferns

took defendant to the interview room, read defendant his *Miranda* rights, and interviewed him, as described above.

At the close of the state's case, defendant moved for a judgment of acquittal on Count 1 (first-degree rape) and Count 3 (first-degree sexual penetration). He argued that there was "no corroboration of [his] statements," that "[H] made no statements about either sexual [penetration], rape, or sodomy," and that there was "no physical evidence" and "no evidence independent of [defendant's] statement to support those things." The state contended that there was enough evidence to go to the jury, explaining that H "made a number of statements about daddy hurting her butt" and that "she did make specific statements about daddy hurting her butt with his wee-wee *** as well." The state further contended that defendant "was alone with [H], had an opportunity to do this and then he confessed his crimes." The court denied defendant's MJOA, and the jury ultimately found defendant guilty on all three charges.

At defendant's sentencing proceeding, the state recommended that the court sentence defendant on each count to a 300-month prison sentence pursuant to ORS 137.700 and a lifetime of post-prison supervision term pursuant to ORS 144.103(2). The state further recommended that the sentence in Count 2 run consecutively to the sentence in Count 1 and the sentence in Count 3 run concurrently to the sentence in Count 2. Defendant renewed his MJOA and contended in his sentencing memorandum that, in light of his PTSD, those sentences were cruel and unusual, disproportionate, and violated his rights under Article I, section 16, of the Oregon Constitution, and the Eighth and Fourteenth Amendments to the United States Constitution. He argued that the applicable mandatory-minimum sentences under ORS 137.700 were unconstitutional on their face and as applied to him.

The trial court again denied defendant's MJOA and sentenced him according to the state's recommendation. In doing that, the court explained:

> "[T]he [c]ourt does not find that Jessica's Law [codified as ORS 137.700] is unconstitutional as applied to [defendant]. Certainly, under these facts, [an ORS 137.700] sentence is not disproportionate.

"What shocks the moral compass or shook this [c]ourt and the public is the sodomy and rape of a four-year-old child. As put on in evidence in the trial, there may not have been physical injury, but as our witnesses testified to, that is rarely, if ever see[n], in these type[s] of cases, which I'm sure exist as the ongoing psychological trauma that is a life sentence for that child and her family."

On appeal, defendant assigns six errors, one to the denial of his motion to suppress, two to the denial of his MJOA on Counts 1 and 3, and the remaining three assignments to his sentences on each of the three counts of which he was convicted.

We begin with defendant's motion to suppress. He contends that his inculpatory statements were erroneously admitted in violation of ORS 136.425(1) and Article I, section 12, of the Oregon Constitution,[6] and that the error was not harmless. Defendant argues that the state failed to meet its burden to prove that his inculpatory statements were voluntary, and that Ferns induced him to confess by fear or promises. *See State v. Powell*, 352 Or 210, 225-26, 282 P3d 845 (2012) (placing that burden on the state); *see also State v. Jackson*, 364 Or 1, 22, 430 P3d 1067 (2018) (requiring the state to prove that a "defendant's free will was not overborne and his capacity for self-determination was not critically impaired, and that he made his statements without inducement from fear or promises"). In his view, Ferns's statements during the interview communicated to him that he would not be arrested if he admitted to abusing H, that liars are the worst type of people, that Ferns would write a report painting defendant to be a liar if he did not admit abuse, and that Ferns would help defendant obtain psychological help if he did admit abuse. Particularly, he argues that, in light of the undisputed fact that he suffered from PTSD connected to his military service, which rendered

---

[6] ORS 136.425(1) provides that "[a] confession or admission of a defendant *** cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats." *See also Vasquez-Santiago*, 301 Or App at 105 (under Article I, section 12, confessions made by a defendant in custody that were induced by the influence of hope or fear, applied by law enforcement, are inadmissible against the defendant); *State v. Jackson*, 364 Or 1, 21, 430 P3d 1067 (2018) (stating that an out-of-court confession is presumed to be involuntary); *Lego v. Twomey*, 404 US 477, 489, 92 S Ct 619, 30 L Ed 2d 618 (1972) (holding that the state must prove voluntariness by a preponderance of the evidence).

him 100 percent disabled, the state failed to establish that his confession was the product of his free will and that his will was not overborne by the alleged inducements. We are not persuaded.

"[C]onfessions are initially deemed to be involuntary and *** the state has the burden to overcome that presumption by offering evidence affirmatively establishing that the confession was voluntary," which the state can prove by "a preponderance of the evidence." *Jackson*, 364 Or at 21. In determining whether a confession was voluntary, rather than coerced, "[c]ourts look to the totality of circumstances," including but not limited to "the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's *** physical condition; and mental health." *Id*. at 28. In making that assessment, it is "helpful to begin with the issue of whether the officers who interrogated [the] defendant induced him to make admissions by the influence of hope or fear." *Id*. at 22. "The ultimate question is whether the state has met its burden to show that [a] defendant's confession was a product of [the] defendant's free will." *State v. Chavez-Meza*, 301 Or App 373, 387, 456 P3d 322 (2019), *rev den*, 366 Or 493 (2020); *see also Powell*, 352 Or at 223 (explaining that a court must make "an individualized inquiry into whether the alleged inducement was sufficiently compelling to influence [the] defendant's decision to confess").

Reviewing defendant's claim for legal error, we conclude that the trial court's findings, which are supported by the record, support its conclusion that defendant's confession was voluntary. *See Jackson*, 364 Or at 21 (setting forth the legal error standard and providing that we are "bound by the trial court's findings of fact if supported by the record"). As an initial matter, the court looked at the totality of the circumstances, as provided in *Jackson*, and made the required individualized findings regarding whether Ferns's statements influenced defendant's confession, as required in *Chavez-Meza* and *Powell*. As the court found, before the interview, defendant understood his rights, including the right to remain silent, Ferns properly administered *Miranda* warnings, and defendant evinced no

signs of confusion. *See Jackson*, 364 Or at 26 (explaining that, although *Miranda* warnings are not determinative of whether a defendant's confession was voluntary, it constitutes an important factor in the analysis of the totality of the circumstances). Moreover, defendant did not manifest atypical physiological responses to stress during the interview and, as the trial court found, Ferns did not observe anything out of the ordinary in defendant's demeanor. In fact, he continued to deny the allegations even after Ferns made the statements that defendant claims were threats or promises. Furthermore, as the court found, none of the experts who testified for defendant and whom the court did not find credible could identify how defendant's PTSD rendered his confession involuntary.

Under the totality of the circumstances, no threats or promises by Ferns induced defendant to the point of overbearing his free will. *See id.* at 21-22 ("[T]he voluntariness of an admission or confession depends on whether or not, in the totality of the circumstances, a defendant's free will was overborne and his or her capacity for self-determination was critically impaired."). The state, therefore, met its burden to show that defendant's confession was a product of his free will. Accordingly, the trial court did not err in denying defendant's motion to suppress.

We turn to defendant's MJOA. In a combined argument, defendant challenges the sufficiency of the evidence to corroborate his confession as to first-degree rape and first-degree sexual penetration and, in turn, to prove that he committed those crimes.[7] *See* ORS 136.425(2) (establishing that a confession must be corroborated to be admitted at trial); *see also State v. Moreno*, 276 Or App 102, 107-08, 366 P3d 839, *rev den*, 359 Or 525, *cert den*, 580 US 937 (2016) (same). According to defendant, the lack of corroborating evidence rendered the evidence insufficient to prove that he committed those crimes and, as such, the court should have acquitted him. *See* ORS 136.445 (providing that the court should acquit a defendant where "the evidence introduced theretofore is such as would not support a verdict against the defendant").

---

[7] Defendant does not challenge his conviction for first-degree sodomy, Count 2.

"We review a trial court's denial of a[n] [MJOA] to determine whether, after viewing the facts in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Moreno*, 276 Or App 107. When a defendant's challenge to the denial of an MJOA involves the sufficiency of evidence to corroborate his confession, we must first determine whether the defendant's confession was corroborated. *Id.* "Only if [the] defendant's confession is supported by legally sufficient corroborating evidence may both the confession and the independent corroborating evidence be considered in determining whether th[e] [MJOA] standard has been met." *Id.*

We proceed with the corroboration issue. The state contends that defendant's confessions of rape and unlawful sexual penetration were corroborated. Regarding rape, the state argues that evidence that H told Snyder that defendant had left a mark with his "wee-wee" on H's vaginal area and Snyder's observation of redness on H's hymen corroborated defendant's confession that he put his penis into H's vagina. We agree.

The *corpus delicti* of first-degree rape includes conduct where a person "ha[d] sexual intercourse with another person" who is "under 12 years of age." ORS 163.375(1)(b). Here, defendant confessed to conduct that meets the elements of first-degree rape. He told Ferns that he had initially attempted to push his penis into H's vagina but was unable to insert it and stopped after inserting it no more than "an inch, if that." While defendant's confession alone would be legally insufficient under ORS 136.425(2) to prove that defendant committed first-degree rape, the state introduced other evidence "from which the jury [could] draw an inference that *tend[ed]* to establish" that defendant pushed his penis into H's vagina. *State v. Hernandez*, 256 Or App 363, 366, 300 P3d 261, *rev den*, 353 Or 868 (2013). That evidence included evidence that H indicated that defendant had "made a mark with his wee-wee"—which H said was in his pants and identified in a drawing—on her vaginal area while they were in "mommy's room," along with signs of redness on H's hymen.

Even if the redness observed was potentially normal, the evidence that the state introduced, viewed in the context of all the evidence, was sufficient to corroborate defendant's confession that he pushed his penis into H's vagina. *See State v. Fry*, 180 Or App 237, 246, 42 P3d 369 (2002) (holding that a child's statements that the "defendant touched her genitalia with his 'thinger' or his 'pee-pee' and that it hurt when he did so," along with a physician's testimony that the pain that the child related "*could have been* the result" of the defendant touching the child's hymen or of the defendant using force was sufficient to corroborate the defendant's confession that he penetrated the child with his penis; although that evidence was "not conclusive evidence," and permitted "more than one inference," it was admissible under ORS 136.425 as "some other proof" that one instance of rape occurred (emphasis added)). Defendant's confession was, thus, admissible to prove his guilt as to the rape charge, and the trial court did not err in denying defendant's MJOA as to Count 1.

Regarding sexual penetration, the state admits that there is no specific evidence that defendant had put his finger in H's anus but contends in two alternative arguments that there was nevertheless sufficient evidence to corroborate defendant's confession. First, the state argues that evidence that defendant had taken H's clothes off, that H was "la[y]ing] facedown with her knees tucked under her stomach," and that there was baby oil in the house, was "arguably" sufficient corroborating evidence, likening this case to *State v. Johnson*, 311 Or App 111, 120-21, 489 P3d 1046, *rev den*, 368 Or 702 (2021) (holding that a child's statement that she "had to put [her] mouth on daddy's pee-pee" and that it had happened "before school" was sufficient to corroborate multiple counts of sodomy and sexual abuse because that statement permitted "a reasonable inference that it *could* refer to multiple instances" of both sodomy and sexual abuse (emphasis in original)). The evidence here, the state argues, considered collectively and in the light most favorable to the state, and given the particular nature and timing of the offenses and the specific circumstances described, was sufficient, given that H would not have been able to differentiate between

defendant penetrating her with his finger and penetrating her with his penis.

Second, the state argues that, even if its first argument fails, defendant's own statement early in his interview with Ferns—that defendant's finger "might have entered" H "once" when he was helping H with a bath as the "soap was really slippery"—was sufficient to corroborate defendant's confession. In the state's view, that statement constituted an admission made separate from his later and clearer inculpatory admissions. As in *State v. Manzella*, the state argues, defendant's prior statement corroborated his subsequent confession. 306 Or 303, 316, 759 P2d 1078 (1988) (holding that a defendant's "assertion that he was rear-ended by another car while waiting to turn left," which was made "to further [the police's] investigation of an automobile accident" and before the defendant's disputed confession, was admissible to corroborate his confession that he had been "driving in violation of his license restrictions").

We are not persuaded. The *corpus delicti* of first-degree sexual penetration includes conduct where a "person penetrate[d] the *** anus *** of another with any object" and that the other person is "under 12 years of age." ORS 163.411(1)(b). Here, defendant confessed that he intentionally put his "middle finger" "[a]ll the way" up H's anus for "[m]aybe two [or] three minutes," and the indictment alleged that defendant penetrated H's anus with "his finger." However, no other evidence corroborates defendant's confession as to that conduct.

Regarding the state's first argument, this case is different from *Johnson*. There, we assessed whether statements made by the alleged child victim, B—including that B had to put her mouth on the defendant's "pee-pee," that it happened "before school," and that the defendant told her that "mommy does it"—which undisputedly corroborated one count of sodomy, also tended to prove that the defendant committed additional counts of sodomy against B, to which he had confessed. *See* 311 Or App at 120. We concluded that the evidence corroborated the defendant's confession because B did not limit the number of times that the conduct occurred, and because each of B's disclosures

appeared to correspond to separate occasions described in the defendant's confession. *Id.* at 120-21 ("While B's disclosure may, in the abstract, be viewed as referring to only a single act, when viewed in the light most favorable to the state, B's statement permits a reasonable inference that it could refer to multiple instances.").

In contrast to *Johnson*, here the issue is whether the evidence is legally sufficient to corroborate defendant's statements admitting conduct distinct from other conduct to which he confessed, rather than to corroborate statements admitting to other occasions of the same conduct. The evidence urged by the state—H's assertions that she was lying "facedown with her knees tucked under her stomach" when defendant put his "wee-wee" in her butt, and that there was baby oil in the house—does not permit, under the circumstances, an inference that defendant penetrated H with his finger. Despite the possibility that H may not have been able to differentiate between whether defendant used his finger or his penis, an inference that defendant used his finger would have required the jury to speculate that H's perception was not accurate. Accordingly, even when viewed in the light most favorable to the state, that evidence did not permit a non-speculative inference that tends to establish that defendant penetrated H with his finger and, hence, did not meet the ORS 136.425 corroboration standard. *See Moreno*, 276 Or App at 109 (to corroborate a confession, "[r]easonable inferences are permissible; speculation and guesswork are not").

Regarding the state's alternative argument that defendant's earlier statement—that his finger "might have entered" H "once" accidentally—corroborated his confession, we are likewise unpersuaded. A defendant's statement can only be used to corroborate the defendant's confession if it is made for some purpose other than to acknowledge guilt, and if it is not so closely related to the confession as to become a part of it. *Manzella*, 306 Or at 315-17, 316 n 13 (emphasizing that "*all* statements made during the course of a confession are protected by ORS 136.425(1)" and that "[t]he state may not dissect a confession and use isolated statements to corroborate the 'core' of the confession" (emphasis in original)).

In *Manzella,* the defendant told a police officer arriving at the scene of an accident that he had been rear-ended while waiting in a traffic lane to make a left turn. *Id.* at 316. Afterwards, the defendant was confronted with information that the officer received from checking the defendant's driver's license, and he confessed to driving with a suspended license (DWS). *Id.* The defendant's initial statement—that he had been rear-ended—could be used to corroborate the driving element of his later confession to DWS, because he made the statement for the purpose of furthering an investigation of an automobile accident, and it was not so closely related to his confession that it became part of it. *Id.* Moreover, that conclusion was bolstered by the fact that the defendant made the statement before being confronted with evidence that his license had been suspended and that a break occurred between that statement and his confession to DWS. *Id.*

By contrast, in *State v. Simons*, the defendant, who worked as a senior nursing assistant, prompted by police questioning about potential patient abuse allegations against him by R and S, told the police that he "noticed R's sexual reaction in the shower, that S grabbed his penis more than once, and that she put her mouth on it at least once." 214 Or App 675, 680-81, 684, 167 P3d 476 (2007), *rev den*, 344 Or 43 (2008). Later, during the same interview, the defendant confessed to allegations related to offenses against R, S, and another victim, all of whom were under his care. *Id.* at 680. Because the trial court found that the defendant's earlier statements were made to acknowledge guilt and because those statements "were so intertwined with his confession as to be part of it" given that there was no temporal break between those statements and his confession, the statements could not corroborate his confession. *Id.* at 685.

This case is more like *Simons* than *Manzella*. In *Manzella*, the subject of the alleged offense had not come up at the time that the defendant made the disputed statement. Here, when defendant told Ferns that his finger "might have entered [H] *** once" while he was bathing her, defendant had already been confronted with the allegations that he had sexually abused H. Like in *Simons*, defendant's statement

was prompted by questioning about the allegations at issue and there was no temporal break between defendant's statement and the confession, which occurred just a few minutes later. As in *Simons*, we conclude that defendant's statements "were so intertwined with his [subsequent] confession as to be part of it." *Id.* at 685. Accordingly, regardless of whether defendant's statements were made for the purpose of acknowledging guilt, those statements could not be used to corroborate defendant's confession to sexual penetration. *See Manzella*, 306 Or at 316 & n 13 (explaining that no statements made during a confession can be used "isolated[ly] *** to corroborate the 'core' of the confession"). The trial court therefore erred in denying defendant's MJOA as to Count 3, first-degree sexual penetration.

We next address defendant's challenges to his sentences. Because we have concluded that the trial court erred in denying defendant's MJOA as to first-degree sexual penetration, we address only the sentences for first-degree sodomy and first-degree rape. Defendant asserts that the trial court erred in sentencing him pursuant to ORS 137.700(2) and ORS 144.103(2) to 300-month prison sentences and a lifetime PPS term for each of those offenses. In two separate arguments, he maintains that those sentences are constitutionally disproportionate, both facially and as applied, under Article I, section 16, and the Eighth Amendment. Defendant recognizes that we have previously held that 300-month prison sentences under ORS 137.700 are not constitutionally disproportionate under Article I, section 16, but he asserts that those cases were wrongly decided. For the same reasons stated in his argument under Article I, section 16, defendant claims that his sentences are cruel and unusual, in violation of the Eighth Amendment. We are unpersuaded.

"A sentence is disproportionate to the offense [under Article I, section 16,] only if it 'shock[s] the moral sense of all reasonable [persons] as to what is right and proper under the circumstances.'" *State v. Wiese*, 238 Or App 426, 428, 241 P3d 1210 (2010), *rev den*, 349 Or 654 (2011) (quoting *State v. Rodriguez/Buck*, 347 Or 46, 57-58, 217 P3d 659 (2009) (brackets in *Wiese*)). We address proportionality challenges under Article I, section 16, using the factors set out in *Rodriguez/*

*Buck*, which include "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." 347 Or at 58.

As defendant acknowledges, we have previously concluded that a 300-month prison sentence required by ORS 137.700 (known as Jessica's Law) is not facially disproportionate after applying the *Rodriguez/Buck* factors. *See, e.g.*, *State v. Hoover*, 250 Or App 504, 280 P3d 1061, *rev den*, 352 Or 564 (2012); *State v. Alwinger*, 236 Or App 240, 236 P3d 755 (2010). Defendant's arguments do not convince us that those cases were wrongly decided or that the facts of this case require a different result. As to the first factor, the severity of the penalty is congruent with the gravity of the crimes—rape and sodomy involving defendant's four-year-old stepdaughter, which occurred on more than one occasion—and defendant's conduct underlying his convictions falls squarely within the type of conduct covered by those offenses. *See State v. Pardee*, 229 Or App 598, 603, 215 P3d 870, *rev den*, 347 Or 349 (2009) (upholding terms of 300 months for each count of sodomy and rape); *see also, e.g.*, *Alwinger*, 236 Or App at 246 (upholding a 300-month prison sentence and a lifetime PPS term for a single occurrence of first-degree unlawful sexual penetration of a child).

As to the second factor, we are not persuaded that defendant's sentences are disproportionate as compared to other more serious and related crimes. *See id.* (recognizing that "it is within the legislature's role to decide that [crimes] justify the same penalty"); *see also Pardee*, 229 Or App at 603 (disagreeing that "because the penalty for intentional murder—300 months' incarceration *without* mandatory lifetime PPS—is less severe than the penalty that [the defendant] received" for each of several rape and sodomy convictions, "the latter penalties [we]re disproportionate" (emphasis in original)).

Finally, the third *Rodriguez/Buck* factor does not assist defendant either. Although defendant has no prior criminal history, in light of his conduct—which involved a four-year-old child to whom he was a father figure and whom he was supposed to protect—his lack of criminal

history has little weight in balancing the proportionality of his sentences and is insufficient to render those sentences unconstitutional. *As such, none of defendant's arguments support his challenge.* Because defendant has not convinced us that ORS 137.700, on its face or as applied here, was disproportionate under the *Rodriguez/Buck* factors, we decline to revisit our prior decisions, as he urges us to do.

Regarding his challenge under the Eighth Amendment, defendant was unable to demonstrate that his sentences were cruel and unusual. Because here he relied on the same argument that he presented under Article I, section 16, with which we disagreed when applying the *Rodriguez/Buck* factors, we reject defendant's Eighth Amendment argument. *See Wiese*, 238 Or App at 429-30 ("[A]nalysis of the three [*Rodriguez/Buck*] factors under Article I, section 16, provide a sufficient basis to decide whether [a] defendant's sentence was * * * cruel and unusual under the Eighth Amendment.").

In sum, the trial court did not err in sentencing defendant pursuant to ORS 137.700 and ORS 144.103, nor did it err in denying his motion to suppress or his MJOA as to first-degree rape. The court, however, erred in denying defendant's motion for judgment of acquittal as to first-degree sexual penetration (Count 3).

Conviction on Count 3 reversed; remanded for resentencing; otherwise affirmed.